**In the Matter of the Application of ORIENTAL REALTY CORP., d/b/a Manhattan Beach Hotel, Petitioner,**

**For an Order Staying Arbitration Commenced by LOCAL 144, ASSOCIATED HOTEL, HOSPITAL, NURSING HOME AND ALLIED SERVICES UNION, SEIU, AFL–CIO, Respondent.**

Nos. 80 C 2840, 80 C 3476.

United States District Court,
E. D. New York.

Sept. 30, 1981.

442

Burns, Jackson, Summit, Rovins & Spitzer by Laurence P. Brown, I. Cathy Glaser, New York City, for petitioner.

Vladeck, Elias, Vladeck & Engelhard, P. C. by Andrew Schulz, New York City, for respondent.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

Petitioner ("Oriental") commenced these actions in State court to stay arbitration proceedings instituted by respondent Local 144 ("union"). The parties' controversy arose out of the union's demand that Oriental make pension contributions and severance pay awards to former employees at the Manhattan Beach Hotel, formerly owned and operated by Oriental. Following removal to this Court, the union moved for summary judgment compelling arbitration of the issues in dispute pursuant to § 4 of the Federal Arbitration Act, 9 U.S.C. § 4. On its part, Oriental moved to enjoin the union's efforts to pursue or conduct arbitration. For the reasons that follow the Court concludes that Oriental, and not the union is entitled to summary judgment and enjoins the latter from pursuing arbitration.

Oriental owned and operated the Manhattan Beach Hotel, located in Brooklyn, from 1953 to November 26, 1980, when it was sold to the Jewish Association for Services for the Aged ("JASA"). In May 1969 Oriental joined Associated Hotels & Motels, Inc., a multi-employer bargaining association whose successor in interest is Metropol-

itan Hotels & Motels, Inc. ("Association"). The Association and the union, which at least since 1969 has been the collective bargaining representative for the Manhattan Beach Hotel's employees, have had a collective bargaining relationship from 1969 to date.

The collective bargaining agreement ("Master Agreement") in effect after Oriental joined the Association provided that it would be effective from June 1, 1969 through May 31, 1973, and that after March 1, 1973, the parties would negotiate terms and provisions of an agreement to be effective thereafter. See Master Agreement, Article XXII(1), (3). By stipulation dated December 1, 1972, the Association and the union provided that except as thereby modified the Master Agreement would continue in full force through May 31, 1976 (First Stipulation, dated 12/1/72, ¶ 12). A second stipulation dated March 9, 1976, further extended the duration of the Master Agreement to May 31, 1978, with reopening on April 1, 1977 for discussion of wage and other benefits (Second Stipulation, dated 3/9/76, ¶ 10). Paragraph 7 of this second stipulation provided in part as follows:

> "The Union and the Association shall appoint a joint committee to study, review and resolve the following issues which, when agreed upon, shall be reduced to writing as an addendum to the contract: . . . (b) The establishment of a schedule for severance pay."

A third stipulation dated October 20, 1977, revised the Master Agreement and earlier stipulations in certain respects and continued its duration for two more years, retroactively from June 1, 1977 to May 31, 1979. Most recently, on April 1, 1980, the union and the Association entered into a further stipulation extending the Master Agreement, effective retroactively from June 1, 1979 to May 31, 1982. This stipulation provided for an award of severance pay for covered employees "in the event that they are permanently laid off for any reason" (Fourth Stipulation, dated 4/1/80, ¶ 14), and increased employer contributions to the pension fund. It also granted as "additional paid holidays" the employee's birthday and Martin Luther King's birthday, raised the wages of non-tipping employees by $10.00 per week retroactive to June 1, 1979, $7.00 retroactive to December 1, 1979 and a further $10.00 effective June 1, 1980, gave four weeks' vacation to employees of over fifteen years' standing, and three days' sick leave with pay for the period June 1, 1980 to May 31, 1981.

It is undisputed that during 1977 Oriental withdrew from the Association, rejoined on October 27, 1977, withdrew again in March 1979 and rejoined on May 8, 1979. This latter date was three weeks before the stated expiration of the Third Stipulation on May 31, 1979. On February 29, 1980 Oriental informed the Association it wished to resign and that the Association was no longer authorized to represent it in any labor contracts.

During March, April and May and through the summer and early fall, the union sought to have Oriental execute a collective bargaining agreement. After these attempts failed because Oriental was negotiating sale and transfer of title to JASA, the union filed notices of intention to arbitrate the pension fund and severance pay disputes on September 16 and December 4, 1980, respectively. These notices prompted Oriental's present actions to stay arbitration. On March 17, 1981, the union filed unfair labor practice charges with the NLRB against Oriental, and on May 21, 1981 the Board issued a consolidated complaint against Oriental and its successor, Manhattan Beach Housing Development Fund Corp., d/b/a Manhattan Beach Hotel. The NLRB complaint alleged that Oriental had engaged in unfair labor practices by refusing to bargain collectively in violation of § 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5), and by interfering with, restraining and coercing its employees in the exercise of rights guaranteed by § 7 of the Act, in violation of § 8(a)(1), 29 U.S.C. § 158(a)(1). The complaint set February 8, 1982 as the hearing date.

The underlying dispute between the parties concerns Oriental's responsibility to

make the severance pay awards and pension fund contributions called for in the Master Agreement, as extended by the April 1, 1980 stipulation. The immediate question presented by the parties' motions, however, involves whether an arbitrator should determine the scope of Oriental's obligations, including, as the union contends, whether Oriental is subject to a collective bargaining agreement, or whether the union should be enjoined from pursuing arbitration.

■ The "courts have long recognized that 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *McAllister Brothers, Inc. v. A & S Transportation Co.*, 621 F.2d 519, 522 (2d Cir. 1980), *quoting United Steelworkers of America v. Warrior and Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960). Moreover, "the question whether the parties have entered into a contract imposing a duty to arbitrate is one that must be decided by the court, not by an arbitrator." *Rochdale Village, Inc. v. Public Service Employees Union, Local No. 80*, 605 F.2d 1290, 1294 (2d Cir. 1979). The union argues, however, that whether Oriental is subject to a collective bargaining agreement calling for arbitration is in this case an issue for the arbitrator to decide. It relies on *Rochdale Village, supra*, where the Court of Appeals stated:

> "If a court finds that the parties have agreed to submit to arbitration disputes 'of any nature or character,' or simply 'any and all disputes,' all questions, including those regarding termination, will be properly assigned to the arbitrator: 'with that finding the court will have exhausted its function, except to order the reluctant party to arbitration.' *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 571 [80 S.Ct. 1363, 1364, 4 L.Ed.2d 1403] (1960)." 605 F.2d at 1295.

While the arbitration clause in the Master Agreement required arbitration of "[a]ll complaints, disputes or grievances arising between the parties hereto involving questions of interpretation or application of any clause of this Agreement, or any acts, conduct or relations between the parties," Master Agreement ¶ VIII(a), the difficulty with the union's reliance on *Rochdale* is that Oriental was bound to arbitrate only by the Third Stipulation, which expired by its terms on May 31, 1979 (Third Stipulation, dated 10/20/77, ¶ 4). The situation here thus differs in a critical aspect from that in *Rochdale*: there the duration clause of the parties' collective bargaining agreement provided that the contract

> "shall continue in effect until the 31st day of October 1978, and thereafter shall be automatically renewed for successive yearly periods unless written notice is given, by either party to the other, of its desire to modify, amend or terminate this Agreement. Such notice shall be given not more than seventy-five (75) days nor less than thirty (30) days prior to the expiration date of this agreement or of any annual extension thereof."

Because the parties disagreed as to when the notice period began and whether the employer's notice had been timely, the court held that these were questions arising "under" the collective bargaining agreement and hence subject to the arbitration clause. 605 F.2d at 1296.

Unlike *Rochdale*, the present case involves simply the issue "whether there is a contract" without any question of "what the contract requires," *Bressette v. International Talc Co.*, 527 F.2d 211, 215 (2d Cir. 1975), or reference to a method of termination that depends on "the construction or effect of terms of the contract," 605 F.2d at 1296. In these circumstances the Court concludes that the collective bargaining agreement expired by its terms on May 31, 1979, and that the union must demonstrate some other contractual obligation to arbitrate than the Third Stipulation.

■ For similar reasons the Court rejects the union's alternative argument that arbitration is required because the Second Stipulation provided that a joint committee of the union and Association would discuss a severance pay schedule which, when ap-

proved, would become an addendum to the contract. For this contention the union relies primarily on *Nolde Brothers, Inc. v. Local 358, Bakery & Confectionery Workers Union,* 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977), where the Court ruled that a dispute about severance pay was subject to arbitration even though the union had terminated the collective bargaining agreement, which contained both the arbitration clause and the provision for severance pay. The Court reasoned that "whatever the outcome" of the underlying dispute, its "resolution . . . hinges on the interpretation ultimately given the contract clause providing for severance pay [*i. e.,* whether the employees' severance rights accrued during the term of the agreement]. The dispute, therefore, although arising *after* the expiration of the collective bargaining agreement, clearly arises *under* that contract." 430 U.S. at 249, 97 S.Ct. at 1071. Citing with approval its earlier decision in *John Wiley & Sons v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), the Court explained that there "the parties' obligation under their arbitration clause survived contract termination when the dispute was over an obligation arguably created by the expired agreement," 430 U.S. at 252, 97 S.Ct. at 1072. The difference that in *Wiley* arbitration of the issue of post-contract severance pay was first sought while the contract was in existence was held immaterial. *Id.*

The expired contract provisions which the union asserts "arguably created" Oriental's severance pay obligations will not bear that construction. The Second Stipulation provides merely that the severance pay schedule would become an addendum to the contract when approved by the Association and the union, which was done in the Fourth Stipulation. Though retroactive to June 1, 1979, the day after the Third Stipulation expired, this stipulation was not entered into until after Oriental had notified the Association it had withdrawn. The Second Stipulation did not by itself even "arguably create" any severance rights between the union and Oriental through the latter's membership in the Association, but merely anticipated that rights would be created when agreed upon. Plainly, the rights to severance pay were only created by the agreement of the union and the Association in the Fourth Stipulation. Yet it is precisely Oriental's position that when that agreement was reached, it had resigned and thus cannot be bound. In sum, while the severance rights at issue here are traceable to actions taken pursuant to the agreements which once bound Oriental, the sequence of events—the expiration of the Third Stipulation, and Oriental's notice of withdrawal from the Association followed by the signing of the Fourth Stipulation—precludes a determination that the rights were created by the Second Stipulation, as continued by the Third.[1]

The union next argues that as a matter of law Oriental's February 29, 1980 withdrawal from the Association was untimely and thus ineffective to keep it from being bound by the provisions of the Fourth Stipulation signed on April 1, 1980. As the Court of Appeals recently stated:

"The rule in this circuit is that once negotiations have begun, a member's attempt to withdraw from a multi-employer bargaining unit is ' "untimely" and therefore ineffectual to relieve him from the obligations of any agreement that is ultimately reached, absent special circumstances or consent by the union.' *N.L. R.B. v. John J. Corbett Press, Inc.,* 401 F.2d 673, 675 (2d Cir. 1968). *Accord, N.L. R.B. v. Sheridan Creations, Inc.,* 357 F.2d 245 (2d Cir. 1968), cert. denied, 385 U.S. 1005 [87 S.Ct. 711, 17 L.Ed.2d 544] (1967)."

*N.L.R.B. v. Independent Association of Steel Fabricators,* 582 F.2d 135, 146–47 (2d Cir. 1978), *cert. denied sub nom. Shopmen's*

---

1. The union also argues that Oriental's withdrawal from the Association at the end of February 1980 was ineffective to terminate the Master Agreement because withdrawal did not comply with the requirements of § 8(d) of the NLRA, 29 U.S.C. § 158(d). This contention ignores the fact that by the express terms of the Third Stipulation there was no contract between Oriental and the union when it withdrew.

**446**

*Local Union No. 455 v. N.L.R.B.*, 439 U.S. 1130, 99 S.Ct. 1049, 59 L.Ed.2d 91 (1979).

■ Without seriously disputing that its withdrawal was untimely under this doctrine, Oriental urges that a genuine issue of material fact exists as to whether the union consented to the withdrawal, which precludes summary judgment.[2] It relies on the conflicting versions of the discussions between the union and Oriental in March, April and May 1980, recounted in the affidavits of the union's business representative, Andrew Enright, and Louis Soss, Oriental's secretary-treasurer and manager of the hotel. Far more important than this dispute, however, is the fact that the union sent the following letter to Soss on June 9, 1980:

"In the past you have abided by the terms and conditions of the collective bargaining agreement between Local 144 and the Metropolitan Hotels and Motels, Inc.

"As you are aware, that contract has expired and we are in the midst of negotiating a successor agreement effective June 1, 1979. However, we have been advised by the Association that you are no longer a member of the Association as of [sic]

"Therefore, we request a meeting with you on Friday, June 20, 1980 at 10:00 am at our offices located at 233 West 49th Street, New York, New York for the purposes of negotiating a collective bargaining agreement. If this meeting is not convenient, please call to make more suitable arrangements."

The union sent the same letter again on September 30, 1980, although omitting the reference to Oriental's withdrawal from the Association.

The Court is of opinion that more than creating a genuine issue of fact regarding consent, or the union's alternate theory of ratification, see *infra*, these letters justify entry of summary judgment in favor of Oriental staying arbitration.[3] The letters are contemporaneous, purposeful communications sent by the union's secretary-treasurer to Oriental. The first unequivocally acknowledged Oriental's withdrawal from the Association, a fact that is underscored by the omission of the reference in the second letter. Moreover, since the letters state the union's purpose in sending them was to set a date for the union and Oriental to "negotiate a collective bargaining agreement," they constitute an admission by the union that at the time they were sent there was no agreement between the parties.

No genuine issue of material fact is created by Enright's present assertion that when he spoke with Soss in March 1980 after Oriental's withdrawal, he believed Oriental was bound by an ineffective withdrawal to execute a contract with the union, since these contacts long antedated secretary-treasurer Kelley's letters to Oriental expressing the union's official view of the parties' relationship. Nor is any such issue created by Enright's assertion that he pressed Soss to sign the Fourth Stipulation or rejoin the Association. Oriental did nei-

---

**2.** Oriental also urges that its contemplated sale of the hotel to JASA was an "unusual circumstance" permitting withdrawal to avoid jeopardizing the transfer because the employees would be covered by a union contract the new owner did not negotiate. It has offered no authority for that contention. The NLRB has found unusual circumstances "to exist in two situations: where extreme financial pressure, such as impending bankruptcy, have threatened an employer's existence, and where the bargaining unit has been substantially fragmented." *N.L.R.B. v. Charles D. Bonanno Linen Service, Inc.*, 630 F.2d 25, 29 (1st Cir.), *cert. granted*, 450 U.S. 979, 101 S.Ct. 1512, 67 L.Ed.2d 813 (1981). The Court of Appeals has also found "unusual circumstances" justifying

withdrawal in a bargaining impasse, *N.L.R.B. v. Independent Ass'n of Steel Fabricators, supra*, 582 F.2d at 145–48.

Oriental's other contention that its withdrawal may be excused because it was unaware of the progress of negotiations is unsupported by authority and contradicted by the fact that it was implementing wage increases announced to members of the Association as resulting from negotiations with the union.

**3.** It is well settled that the Court may enter summary judgment for the non-moving party. See *Morrissey v. Curran*, 423 F.2d 393 (2d Cir. 1970); 6 Moore's Federal Practice, ¶ 56.12 (2d ed. 1980).

 

ther. Significantly, the letters omit any reference to a basis for an agreement between Oriental and the union other than what they might achieve through collective bargaining. In sum, the only reasonable inference from the letters is that when they were sent the union was not holding Oriental to the terms of the Fourth Stipulation earlier negotiated by the Association.

Since the letters establish that the union's own position was that it did not have an agreement with Oriental, summary judgment is also required in Oriental's favor with respect to the union's assertion that Oriental ratified or adopted the Fourth Stipulation and Master Agreement by conduct. Undoubtedly parties may agree to be bound by a written contract negotiated by other parties, see *Roadway Express, Inc. v. General Teamsters, Chauffeurs and Helpers Union, Local 249*, 330 F.2d 859, 863 (3d Cir. 1964). Furthermore, such an agreement can be manifested by the parties' conduct, without need for an independent signed writing. See *N.L.R.B. v. Haberman Construction Co.*, 641 F.2d 351, 355–56; see also *Certified Corp. v. Hawaii Teamsters and Allied Workers, Local 996, IBT*, 597 F.2d 1269, 1272 (9th Cir. 1979); *Rabouin v. N.L.R.B.*, 195 F.2d 906, 909–10 (2d Cir. 1952).

The union's reliance on the decisions just cited is misplaced, however, since in none of them was there evidence, as there is here, demonstrating the absence of agreement between the parties. The union is bound by the letters it sent; it was not compelled to approach Oriental on the terms it did. While there seems to be no genuine dispute that Oriental implemented provisions of the Fourth Stipulation relating to wages and holidays, the letters, which are contemporaneous with Oriental's conduct, effectively repudiate such a basis for agreement between the parties by their repeated request for opportunity to negotiate a collective bargaining agreement. Although the union now explains that in substance negotiation would have been limited to removing provisions of the Master Agreement that pertained only to the Association, the argument is an obvious afterthought at odds

with the plain meaning of "negotiate." It is plain that neither party considered that Oriental's conduct brought about an agreement between them.

In accordance with the foregoing, and with no other basis for an obligation to arbitrate appearing in the record, Oriental is entitled to injunctive relief staying arbitration. See *American Broadcasting Companies, Inc. v. American Federation of Television and Radio Artists*, 412 F.Supp. 1077, 1082 (S.D.N.Y.1976); *District 2 Marine Engineers Beneficial Association v. Falcon Carriers, Inc.*, 374 F.Supp. 1342 (S.D.N.Y. 1974). Therefore, it is

ORDERED that Local 144 Associated Hotel, Hospital, Nursing Home and Allied Services Union, SEIU, AFL–CIO, is hereby enjoined from pursuing its noticed arbitration proceedings, and from instituting new proceedings, with respect to Oriental's asserted obligations to make pension fund contributions, and severance payments to discharged employees of the hotel.