845 F.2d 48
 AMERICAN HOME ASSURANCE COMPANY, General Electric Credit
Corporation, GMAC Commercial Corporation, Grange Mutual
Casualty Company, McDonnell Douglas Finance Corporation, MIC
Property & Casualty Insurance Corporation, Motors Insurance
Corporation, Nationwide Life Insurance Company, Progressive
American Insurance Company, Progressive Casualty Insurance
Company, Progressive Specialty Insurance Company,
Transatlantic Reinsurance Company, Westinghouse Credit
Corporation, Plaintiffs-Appellees.
v.
BALTIMORE GAS & ELECTRIC COMPANY, Defendant-Appellant.
 No. 541, Docket 87-7812.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 14, 1987.
Decided April 21, 1988.
 
 Loretta A. Preska, New York City (Craig J. Albert, Anthony L. Paccione, Hertzog, Calamari & Gleason, New York City, of counsel), for defendant-appellant.
 James W.B. Benkard, New York City (James L. Kerr, Denis J. McInerney, Davis, Polk & Wardwell, New York City, of counsel), for plaintiffs-appellees.
 Louis H. Willenken, Peter C. Williams, Philip R. Brown, Reid & Priest, New York City, for amicus curiae Pennsylvania Power & Light Co.
 Before MESKILL, KEARSE and MAHONEY, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 The issue on this appeal is the proper interpretation of Section 6.2 of the Preference Stock Purchase Agreement (the Agreement) that defendant-appellant Baltimore Gas & Electric Company ("BG & E" or "the Company") entered into with a number of sophisticated institutional investors, including the plaintiffs-appellants in this action, American Home Assurance Company, et al. (the Holders).[1] The Holders filed a complaint seeking a declaratory judgment that BG & E's attempted repurchase of shares under the Agreement was void because BG & E had not fulfilled the requirements for repurchase that were imposed on it by Section 6.2 of the Agreement. BG & E then filed a motion under Fed.R.Civ.P. 56 for summary judgment dismissing the complaint. Following oral argument, the United States District Court for the Southern District of New York, Haight, J., issued a Memorandum Opinion and Order on May 20, 1987 (the Opinion) denying BG & E's motion. The Holders then moved for summary judgment based on the Opinion. The district court granted this motion as a "necessary conclusion to be drawn from" the Opinion. The district court's Final Order and Judgment declaring BG & E's attempted repurchase of the shares to be void and ordering the payment of back dividends with interest was entered on July 22, 1987.
 
 
 2
 We affirm the district court's orders for the reasons indicated below.
 
 BACKGROUND
 
 3
 BG & E, a public utility company, entered into the Agreement on April 8, 1981. Under the Agreement, the Holders purchased 500,000 shares of BG & E's preference stock (the 12% Shares) for $50 million. Section 6.2 of the Agreement, which is sub-captioned "Loss of Dividends Received Deduction," is included in the section of the contract captioned "Covenants of the Company." The first paragraph of Section 6.2 states:
 
 
 4
 This Agreement has been entered into on the assumptions that for Federal income tax purposes (a) the Stock will constitute equity rather than debt, (b) the dividends on the Stock will constitute dividends, and (c) the dividends on the Stock will be eligible for the Dividends Received Deduction.
 
 
 5
 In order to preserve the after-tax yield to the Holders, BG & E agreed in Section 6.2 to indemnify a Holder if the Holder loses "the right to claim or suffer disallowance with respect to all or any part" of the Dividends Received Deduction (DRD) by paying, not later than sixty days following receipt of written notice of such loss, "such sums as, when taken together with the dividends paid to such Owner as of the date of such notice of Loss with respect to the Stock," would cause the effective after-tax yield to be 11.172 percent per annum. Section 6.2 also provides that BG & E is entitled to repurchase the Holders' 12% Shares at par if one of two events occurs: (1) BG & E receives written notice from any Holder of a loss of all or part of their DRD; or (2) BG & E makes a "good faith determination that there is substantial risk that it would be required to make any indemnity payments pursuant to this Section 6.2 (regardless of whether the Company shall have received any such written notice of Loss)." In the instant case, it is the proper interpretation of the language concerning the second triggering event that is at issue.
 
 
 6
 At the time the Agreement was entered into, dividends received by the Holders were entitled to an 85 percent DRD under section 243(a)(1) of the then existing Internal Revenue Code. In October 1986, pursuant to the Tax Reform Act of 1986, the DRD was lowered from 85 percent to 80 percent. See Pub.L. No. 99-514, Sec. 611(a)(1), 100 Stat. 2085, 2249 (1986). The Holders' after-tax yield was thereby reduced by a small amount. At that time, the Holders' stock was worth approximately $8,780,000 more than its par value, while the total amount of indemnity payments that the Holders would receive if they made indemnity demands would be approximately $65,000. Naturally, no holder requested an indemnity payment because of the change in the tax law.
 
 
 7
 BG & E contends, however, that it can repurchase the shares at par because of the reduction in the DRD. Specifically, BG & E argues that it can base the good faith determination required under the second triggering event of Section 6.2 of the contract solely on the fact that the DRD, and consequently the Holders' after-tax yield, was reduced by a mathematically determinable amount. It concedes that it "did not in any way consider whether or not [the Holders] would ask for indemnity." J.App. at 416. Rather, BG & E's position is that the Holders' "desires and their requests are wholly irrelevant here." Id.
 
 
 8
 Based upon its belief that it had made the necessary good faith determination, BG & E sent a notice of intent to repurchase to the Holders on November 26, 1986. Each notice stated:
 
 
 9
 As you know, the Preference Stock Purchase Agreement dated as of April 8, 1981 relating to the 12% Series (the "Agreement") provides that we may purchase all outstanding shares if we in good faith determine that there is a substantial risk that we would be required to make any indemnity payments pursuant to Section 6.2. It is clear that the reduction of the dividends received deduction from 85% to 80% for dividends received after December 31, 1986 as provided by the Tax Reform Act of 1986 (the "Act") presents a substantial risk that the Company will be required to honor its contractual obligation to make indemnity payments under Section 6.2. Consequently, we have elected to purchase the 12% Series.
 
 
 10
 Upon receiving BG & E's notice of intent to repurchase the 12% Shares, the Holders sent letters to BG & E purporting to relinquish their rights to receive any indemnity payments from BG & E as a result of the reduction in the DRD under the Tax Reform Act of 1986. Notwithstanding these letters, which BG & E maintains are invalid attempts by the Holders unilaterally to waive rights and amend the Agreement, BG & E on or about January 2, 1987 sent to the Holders payment for their 12% Shares.
 
 
 11
 The Holders then instituted this action seeking a declaration that BG & E did not make the good faith determination of substantial risk required by the Agreement, and that consequently BG & E's attempted repurchase of the Holders' stock was void. BG & E moved for summary judgment dismissing the complaint. The district court held that it could not accept BG & E's interpretation of the contract that "the shareholders' desire for (or antipathy to) indemnity is entirely irrelevant to that calculation upon which BG & E posits its present notices of repurchase." J.App. at 370. Rather, the court concluded that a Holder's notice of loss and claim is the sole external force that generates BG & E's obligation to pay indemnity, and that in making the good faith determination of substantial risk that an investor will make an indemnity claim in the future, BG & E must take into account "the economic interests or reasonably predictable preferences of investors such as plaintiffs." J.App. at 371-73. Since BG & E conceded that it did not consider the economic interests or desires of investors, the court reasoned that it could not have made the required good faith determination that there was a substantial risk that it would be required to make indemnity payments. The court consequently granted the Holders' motion for summary judgment and declared that BG & E's attempted repurchase of the 12% Shares was void.
 
 DISCUSSION
 
 12
 On appeal, BG & E contends that the district court interpreted the relevant language in the contract contrary to the language and structure of the Agreement as a whole, and that under the proper interpretation of the contract, there was no genuine dispute that a condition triggering BG & E's right to repurchase had occurred, i.e., the decrease in the DRD under the new tax laws.
 
 
 13
 A court can decide the proper interpretation of language in a contract when the language is unambiguous and reasonable persons could not differ on its meaning. Rothenberg v. Lincoln Farm Camp, Inc., 755 F.2d 1017, 1019 (2d Cir.1985). Conversely, when the contract language is susceptible of at least two fairly reasonable interpretations, there is a triable issue of fact and summary judgment is inappropriate. Id. In this case, we conclude that the contract could not reasonably be interpreted as supporting BG & E's position that it had a right to redeem the 12% Shares because of a change in the tax law that reduced the Holders' DRD by a small amount without considering whether the Holders would request indemnity payments because of the change in the DRD.
 
 
 14
 Section 6.2 of the Agreement explicitly provides that if a Holder "shall lose the benefit of, lose the right to claim or suffer disallowance with respect to, all or any part of the Dividends Received Deduction with respect to dividends actually distributed on or with respect to the Stock," then BG & E "shall pay to such [Holders] not later than 60 days following written notice to [BG & E] by such [Holder] of such Loss, such sums as" are necessary to maintain the Holders' effective after-tax yield at 11.172 percent. Considering this provision, we believe that the district court was correct in concluding that:
 
 
 15
 [T]he Agreement contains no self-generating indemnity provision. By "self-generating" I mean a set of circumstances unrelated to the economic situation and preference of the investors. BG & E is required to make indemnity payments to an owner of shares only if the owner sends the company a written notice of loss, partial or total, of the DRD.... Absent such notice and claim no obligation on the part of BG & E to pay indemnity to anyone arises.
 
 
 16
 J.App. at 371. Furthermore, we do not agree with BG & E that this language in Section 6.2 merely measures the time within which indemnity payments are to be made pursuant to a Holder's request. Rather, we believe, as did the district court, that this language that BG & E shall make an indemnity payment not later than sixty days after written notice indicates that BG & E is required to make an indemnity payment only if a Holder sends BG & E written notice of a loss in the DRD.
 
 
 17
 As to BG & E's option to repurchase, that option is triggered by either (1) an investor's notice of loss and claim for indemnity, or (2) BG & E's good faith determination that there is substantial risk that it would be required to make indemnity payments. In light of our conclusion that BG & E can only be required to make indemnity payments if a Holder sends a notice of loss to BG & E, we deduce that in order to meet the requirements of the second triggering event, BG & E must make a good faith determination that there is substantial risk that a Holder will send a notice of loss to BG & E. In reaching this conclusion, we note that the use of the word "would" does not render ambiguous the language "good faith determination that there is substantial risk that it would be required to make any indemnity payments." (emphasis added). If a Holder's notice of loss is the only event that can "require" BG & E to make indemnity payments, then we think that it is reasonable to conclude that "would" refers to whether the Holders will send such a notice.
 
 
 18
 On the other hand, we do not believe that it is reasonable to conclude that "would" refers to whether BG & E will have to pay the indemnity if a Holder sends a notice of loss. If we interpreted "would" in this manner, then BG & E would have the right to redeem the 12% Shares if there is any change in the tax laws that slightly reduces the Holders' DRD, whatever the likelihood that any Holder would choose to exercise its right to indemnity payments because of the change in the law. If the contract were interpreted in this manner, then it would be difficult to give any meaning to the phrases "good faith determination" and "substantial risk." For example, there ordinarily is no reason to introduce an element of "good faith" into a "determination" whether a provision of the Internal Revenue Code has been amended. Similarly, under this interpretation of the contract, any change in the tax laws that reduces the DRD, even by an infinitesimal amount, would automatically confer upon BG & E the right to redeem the stock. Thus, no determination at all about the "risk" of making indemnity payments would have to be made if "would" were given such an interpretation. Taking into account the principle that an interpretation of contract language "that gives a reasonable and effective meaning to all the terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect," Rothenberg, 755 F.2d at 1019, we conclude that the contract cannot reasonably be interpreted as granting BG & E the right to redeem the 12% Shares because of a change in the tax laws that reduces the Holders' DRD by a small amount, without any consideration of whether there is a substantial risk that the Holders will request indemnity payments because of the change.
 
 
 19
 BG & E argues that the second triggering provision should not be interpreted as referring to whether the Holders desire indemnity or else both triggering events which give BG & E the right to redeem its stock would mean the same thing. We do not agree. Rather, we believe that there is a valid distinction between a demand that has already been made (which depends on the Holders) and a determination by BG & E that a demand will be made in the future (which depends on what BG & E in good faith believes the Holders will do in the future).
 
 
 20
 We thus conclude that under any reasonable interpretation of the contract language, BG & E has to make a determination concerning the likelihood that the Holders will request indemnity. BG & E concedes it has not done so here. Accordingly, the district court properly denied BG & E's motion for summary judgment and granted the Holders' motion for a declaratory judgment that BG & E's attempted repurchase of the Holders' stock at par was void.
 
 
 21
 Our holding in this case is a narrow one, and it does not by itself preclude BG & E in the future from making the "good faith determination" required by the contract. We note that in reaching the narrow question before us in this case, we do not consider the Holders' letters to BG & E that purport to relinquish their rights to indemnity. As the district court stated, it is possible to divine the rights and obligations of the parties in this case from the language of the Agreement, without considering this correspondence. We express no view as to the impact of the purported "waivers" by the Holders on BG & E's ability to make a good faith determination in the future.
 
 CONCLUSION
 
 22
 For the above-mentioned reasons, we affirm the district court's orders.
 
 KEARSE, Circuit Judge, dissenting:
 
 23
 While I could perhaps agree that we should not reverse a ruling that as a matter of fact the agreement between defendant Baltimore Gas & Electric Co. ("BG & E" or the "Company") and the plaintiff owners of BG & E stock did not allow the repurchase of shares attempted by BG & E here, I respectfully dissent from the majority's decision that the district court properly reached that conclusion as a matter of law.
 
 
 24
 I have no disagreement with the abstract legal principles invoked by the majority. It is well established that the objective of contract interpretation is to give effect to the expressed intentions of the parties. E.g., Rothenberg v. Lincoln Farm Camp, Inc., 755 F.2d 1017, 1019 (2d Cir.1985) (reversing grant of summary judgment), and that where the language of the contract is unambiguous and reasonable persons could not differ as to its meaning, the question of interpretation is one of law to be answered by the court. Id. However, " '[w]here contractual language is susceptible of at least two fairly reasonable interpretations, this presents a triable issue of fact, and summary judgment [is] improper.' " Heyman v. Commerce & Industry Insurance Co., 524 F.2d 1317, 1320 (2d Cir.1975) (quoting Aetna Casualty & Surety Co. v. Giesow, 412 F.2d 468, 471 (2d Cir.1969)). The latter principle is the one that should govern here, for the pertinent part of the contract at issue is ambiguous and is susceptible to at least two reasonable interpretations.
 
 
 25
 The indemnity and repurchase provisions are set forth in p 6.2 of the parties' agreement. That paragraph, an 1,800-word provision running four single-spaced pages, was aptly described by the district court as a provision of "stupefying legal density," with its key phrase lying "entombed in a single sentence of 82 typed lines which turns tormentedly upon itself like a wounded animal." Memorandum Opinion and Order dated May 20, 1987, at 3. Stripped of much that is not germane to the present dispute, p 62 reads in part as follows:
 
 
 26
 If under any circumstances or for any reason whatsoever [the Owner] ... shall lose the benefit of, lose the right to claim or suffer disallowance with respect to, all or any part of the Dividends Received Deduction ... with respect to the Stock (any such treatment, loss or disallowance being hereinafter called a "Loss"), then ... the Company shall pay to such Owner, not later than 60 days following written notice to the Company by such Owner of such Loss, such sums as ... shall be required ... to cause such Owner's effective after-tax yield ... to be 11.172000% per annum ...; provided, however, that if ... the Company shall have received any such written notice of Loss or if the Company shall have made a good faith determination that there is substantial risk that it would be required to make any indemnity payments pursuant to this Section 6.2 (regardless of whether the Company shall have received any such written notice of Loss), then, in lieu of making any indemnity payments ..., the Company ... shall have the right to purchase ... all the 1981 Series A Stock or 1981 Series B Stock, as the case may be, then owned by all Owners....
 
 
 27
 I regard the language of the proviso, and in particular that part which refers to a substantial risk that the Company "would" be required to make any indemnity payments, as being susceptible to at least one reasonable interpretation other than that adopted by the district court and the majority.
 
 
 28
 The majority and the district court interpret this part of the agreement as providing that the Company may repurchase only if there is a substantial risk that an owner "will," majority opinion ante at 51, send the Company a notice of loss and as requiring the Company to determine whether the owners will in fact make such demands, id. at 51-52. The agreement itself, however, does not say this. Nor does it use the word "will".
 
 
 29
 Rather, the proviso allows the Company to repurchase if it has made a good faith determination that there is a substantial risk that it "would" be required to make any indemnity payments. What makes the proviso inherently ambiguous is its use of the word "would"--plainly a subjunctive here--and its failure to specify what condition or conditions (if, indeed, any were intended other than an event of loss) were intended to trigger the subjunctive obligation to indemnify. Given the use of the subjunctive and the lack of specificity as to trigger, I think it not unreasonable to read the proviso as meaning that the parties intended that the Company might repurchase upon its good faith determination that an event had occurred which, if any owner so chose, would trigger the Company's obligation to indemnify. Such an interpretation seems especially reasonable in light of the proviso's explicit indication that the Company could determine that it "would" be required to make such payments "regardless of whether" it had received written notice of loss from an owner. Further, the fact that if the Company determines in accordance with p 6.2 that it would be liable to any owner, it has the right to repurchase from all owners would seem to make it less reasonable to infer, as the majority does, that the parties intended to require the Company to determine that any single owner "will" give notice of loss, than to infer, as I think permissible, that they intended it to determine simply whether it "would" be liable if any single owner chose to give such notice.
 
 
 30
 Regardless of which interpretation should be chosen, however, the meaning of the agreement should not have been decided by the district court as a matter of law, and this Court should not affirm the granting of summary judgment.
 
 
 
 [1]
 It should be noted that this Agreement is similar to other purchase agreements under which several other public utilities have issued preferred stock to institutional investors. For example, Pennsylvania Power & Light Co., amicus curiae in the instant case, has entered into a similar type of purchase agreement