858 F.2d 825
 McDONNELL DOUGLAS FINANCE CORPORATION, Peoples Security Life
Insurance Company, Commonwealth Life Insurance Company and
National Standard Life Insurance Company, GEICO Corporation,
Government Employees Insurance Company and Criterion
Insurance Company, CNA Assurance Company of Connecticut,
Plaintiffs-Appellees,
v.
PENNSYLVANIA POWER & LIGHT COMPANY, Defendant-Appellant.
 Nos. 366, 369 and 370, Dockets 87-7606, 87-7608 and 87-7610.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 16, 1987.
Remanded June 15, 1988.
Decided After Remand Sept. 16, 1988.
 
 Peter C. Williams, New York City (Louis H. Willenken, Philip R. Brown, Reid & Priest, New York City, of counsel), for defendant-appellant Pennsylvania Power & Light Co.
 Rory O. Millson, New York City (Anne M. Coughlin, Cravath, Swaine & Moore, New York City, of counsel), for plaintiffs-appellees McDonnell Douglas Finance Corp., Peoples Sec. Life Ins. Co., Com. Life Ins. Co., Nat. Standard Life Ins. Co., GEICO Corp., Government Employees Ins. Co. and Criterion Ins. Co.
 David S. Acker, Chicago, Ill. (Thomas R. Bearrows, Winston & Strawn, Chicago, Ill., David S. Patterson, Breed, Abbott & Morgan, New York City, of counsel), for plaintiff-appellee CNA Assur. Co. of Connecticut.
 Before KAUFMAN, MESKILL and KEARSE, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 In this appeal, we must construe a narrow and specific arbitration clause in a contract to determine whether the parties intended it to reach a particular dispute that has arisen out of an agreement governing the purchase of shares of preferred stock. The case is a consolidation of three separate lawsuits filed against defendant-appellant Pennsylvania Power & Light Co. (PP & L), a public utility that raises capital in part through the issuance of preferred shares. In 1986, PP & L sought to redeem, at par value, thousands of preferred shares issued in earlier years. In so doing, PP & L claimed to be acting pursuant to detailed agreements that governed the issuance and sale of those shares. The plaintiffs-appellees, all institutional investors that held shares affected by the call for redemption, argued that PP & L's action was not authorized by the agreements. After the shareholders initiated these lawsuits in the United States District Court for the Southern District of New York, seeking declaratory relief and damages, PP & L moved for a stay pending compulsory arbitration of the dispute.
 
 
 2
 The district court, Conner, J., denied the motion, ruling that the contract provision upon which PP & L relied did not manifest an intention by the parties to submit this particular dispute to arbitration. See GEICO Corp. v. Pennsylvania Power & Light Co., 669 F.Supp. 590 (S.D.N.Y.1987). We then dismissed PP & L's initial appeal from the district court's order, holding that we lacked appellate jurisdiction. See McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co., 849 F.2d 761 (2d Cir.1988) (McDonnell Douglas I ). However, on remand, the district court certified the order for immediate interlocutory appeal pursuant to 28 U.S.C. Sec. 1292(b) (1982 & Supp. IV 1986). We now accept that certification and affirm the district court's order denying a stay pending arbitration.
 
 BACKGROUND
 
 3
 PP & L is a public utility corporation organized and operating under the laws of the Commonwealth of Pennsylvania. In late 1982, PP & L issued 340,000 shares of 14% Series Preferred Stock (the 14% Series) at a par value of $100 per share. Many of those shares either were sold directly to or subsequently transferred to appellees Government Employees Insurance Co. (GEICO); GEICO Corporation (GEICO Corp.); Criterion Insurance Co.; CNA Assurance Co. of Connecticut (CNA); Peoples Security Life Insurance Co. (PSLIC); Commonwealth Life Insurance Co. (CLIC); and National Standard Life Insurance Co. (NSLIC). In early 1983, PP & L issued 260,000 shares of 11% Series Preferred Stock (the 11% Series), also at a $100 par value. Many of those shares either were sold to or later transferred to appellees McDonnell Douglas Finance Corp. (MDFC), GEICO, CNA and Criterion. Both issuances and all subsequent sales were governed by detailed Preferred Stock Purchase Agreements (the Agreements), which were identical in all relevant respects. The Agreements also incorporated the terms of statements governing the original issuances that were filed by the utility with the Commonwealth of Pennsylvania (the Statements).
 
 
 4
 At the time the original purchases were negotiated, prospective shareholders were anxious to "lock in" the high yields offered by the shares. See J.App. at 491. Because PP & L could not issue "non-callable" or irredeemable shares, it agreed to pay premiums over par in the event of any early redemption. See id. These premiums were set out in section 2.2 of the Statements governing the issuance of the shares. The utility could redeem shares in the 14% Series according to a graduated schedule of decreasing redemption values, with the price set at $120 per share for the twelve month period beginning October 1, 1986. The 11% Series shares could be redeemed at $125 per share at any time on or before March 31, 1988.
 
 
 5
 As another indication of the shareholders' attempt to "lock in" after-tax yields on the shares, Paragraph 4N of the Agreements explicitly embodied the parties' assumption that all shareholders would remain eligible for the eighty-five percent Dividends Received Deduction then provided by section 243(a)(1) of the Internal Revenue Code, 26 U.S.C. Sec. 243(a)(1) (1982). The parties agreed that if any shareholder "shall lose the benefit of, lose the right to claim or suffer disallowance with respect to dividends on the shares," then PP & L would indemnify the shareholders for any economic loss below anticipated after-tax yields. That obligation of the company, however, was expressly subject in both Agreements to a proviso that read:
 
 
 6
 provided, however, that if the Company shall have received any such written notice of [a] Loss [requiring indemnification] or if the Company shall have made a good faith determination that there is substantial risk that it would be required to make any indemnity payments pursuant to this paragraph 4N with respect to more than two consecutive quarters (regardless of whether the Company shall have received any such written notice of Loss), then the Company, at its option, may redeem all the Shares then outstanding at the redemption price of $100 per share plus dividends accrued to the date of redemption.
 
 
 7
 This right of redemption at par value was not subject to the terms of section 2.2 of the Statements that required premiums over par in the event of an optional redemption. Finally, Paragraph 4N of the Agreements provided that:
 
 
 8
 If the Company should disagree with any Owner's computation of the amount of the required indemnity payment or refund thereof as provided below or if any Owner should disagree with such good faith determination of the Company that there is substantial risk, then the Company and the Owner shall appoint an independent tax counsel to resolve the dispute and, if the parties cannot agree to the appointment of such counsel, said independent tax counsel shall be appointed by the American Arbitration Association and the Company shall not be obligated to pay, and such Owner shall not be obligated to refund, the disputed portion of such amount until and only to the extent that such dispute is resolved adversely to the party required to make payment.
 
 
 9
 Subsequently, the Tax Reform Act of 1986 reduced the amount of the Dividends Received Deduction provided by section 243(a)(1) of the Code from eighty-five to eighty percent. See Pub.L. No. 99-514, Sec. 611(a)(1), 100 Stat. 2085, 2249 (1986). Based on that development, PP & L sent a letter on October 22, 1986 to all shareholders of the 14% Series and the 11% Series, informing them that it intended to redeem the shares at par value on December 31, 1986. The letter stated:
 
 
 10
 The redemption is being made pursuant to the provisions of Paragraph 4N of the Purchase Agreements.... The Tax Reform Act of 1986 ... provides for a reduction of the dividends received deduction from 85% to 80% for dividends received after December 31, 1986. As a result of the enactment of this legislation, the Company has determined that a Loss (as defined in Paragraph 4N of the Purchase Agreements) would occur beginning with the payment of a regular quarterly dividend ... on January 1, 1987 and would require the Company to make indemnity payments to the owners ...pursuant to Paragraph 4N of the Purchase Agreements.
 
 
 11
 PP & L therefore believed that it had made a "good faith determination" that there was a substantial risk it would be required to make indemnity payments as a result of the passage of the Tax Reform Act. However, none of the shareholders of either the 14% Series or the 11% Series demanded any indemnity payments. In fact, during the period between October 22 and the date set for redemption, many of the shareholders that are appellees here sent the utility letters attempting to waive their right to any indemnity payments as a result of the Tax Reform Act. PP & L rejected those waivers, notifying the shareholders that the letters were of doubtful enforceability and were nonetheless too late to affect the utility's proper exercise of a right of redemption created by the Agreements.
 
 
 12
 On December 9, 1986, plaintiffs-appellees GEICO, GEICO Corp. and Criterion filed the first complaint in this lawsuit (the GEICO complaint), seeking declaratory relief. The plaintiffs alleged that PP & L had "wrongfully" called for redemption of shares in both Series. The gravamen of the complaint was that the plaintiffs' waivers had negated any right of redemption under Paragraph 4N and that PP & L therefore could only redeem the shares if it paid the premiums required by section 2.2 of the Statements. The plaintiffs also alleged that the "real reason" for PP & L's redemption was the utility's desire to avoid paying the high dividends over the remainder of the life of the shares. The plaintiffs alleged that PP & L had not sought to redeem other, lower-paying shares as a result of the Tax Reform Act.
 
 
 13
 On December 31, the day set for redemption, other shareholders filed two additional complaints. One complaint, filed by appellee MDFC, was virtually identical to the GEICO complaint. The other, filed by CNA, differed in some respects. CNA alleged that the call for redemption was in "bad faith" and that "PP & L's motive for the redemption is to avoid either paying the dividends on its preferred shares or redeeming them at the premium it agreed to when it sold them." In essence, however, the CNA complaint was similar to the others in that it placed primary reliance on the effect of the plaintiff's waiver on any right to indemnification as a result of the Tax Reform Act.
 
 
 14
 Before PP & L answered any of the complaints, the three original plaintiffs amended the GEICO complaint. The amended complaint stated that on December 31 the plaintiffs had transferred their shares to a third party in response to the utility's call for redemption. The plaintiffs, however, had accompanied the shares with letters stating that delivery of the certificates and receipt of any payment "shall be without prejudice to any claims we may have against PP & L ... by reason of the wrongful purported redemption of these shares." The amended complaint sought damages representing the difference between the shares' par value and the premiums required by section 2.2 of the Statements. MDFC soon amended its complaint in similar fashion, also adding three new plaintiffs: PSLIC, CLIC and NSLIC.
 
 
 15
 PP & L answered all of the complaints in February. PP & L admitted all factual allegations, but denied the plaintiffs' characterizations of its redemption as "wrongful" and in "bad faith." The utility acknowledged that "the desire to reduce its cost of capital" was a factor in its decision to call for the redemption, but denied that its actions were outside the intended scope of the parties' Agreements. The utility also denied that the shareholders' attempted waivers negated its power to call for the redemption at par.
 
 
 16
 A pretrial conference involving all of the parties to the instant action was held before Judge Conner on February 20. PP & L argued that the utility's right to redeem could be determined by summary judgment. The shareholders responded that any question of the utility's "good faith" would have to be decided by a jury. The utility argued, however, that it did not read the plaintiffs' complaints as challenging PP & L's exercise of good faith under Paragraph 4N. Although the parties disagree as to the extent of Judge Conner's agreement or disagreement with them on this matter, Judge Conner did grant the plaintiffs additional time to amend their complaints to clarify the nature of their allegations regarding the utility's good faith. At the close of this conference, PP & L notified the plaintiffs for the first time that it would consider moving for compelled arbitration under the terms of Paragraph 4N. The shareholders, however, had argued during the conference that the clause calling for the appointment of an independent tax counsel was only intended to cover disputes regarding relevant tax law issues and not disputes as to the utility's good faith.
 
 
 17
 The plaintiffs in the GEICO and MDFC actions thereafter filed second amended complaints and CNA amended its original complaint, all specifically alleging that PP & L had failed to make a good faith determination that a substantial risk of indemnification existed, as required by Paragraph 4N. PP & L subsequently notified the plaintiffs by letter that it intended to move pursuant to sections 3 and 4 of the Federal Arbitration Act (Act), 9 U.S.C. Secs. 3, 4 (1982), for a stay pending compulsory arbitration of the dispute regarding its good faith. In an affidavit accompanying notice of that motion to the court, a PP & L official stated that the utility's decision to seek arbitration was in direct response to the plaintiffs' new allegations in their amended complaints. The plaintiffs subsequently filed opposing papers, including affidavits in which a GEICO Corp. official and attorneys involved in these and other related transactions argued that the parties had never intended to submit disputes concerning the utility's good faith to an independent tax counsel. Rather, those affiants claimed that the purported "arbitration clause" had only been intended to reach tax issues that might arise out of a call for redemption.
 
 
 18
 In an Opinion and Order dated July 2, 1987, Judge Conner denied PP & L's motion for a stay pending compulsory arbitration. Relying solely on our decision in Fuller v. Guthrie, 565 F.2d 259 (2d Cir.1977), the district court held that the parties' Agreements did not contain "a clear, explicit statement" of their intent to submit such a dispute to binding arbitration. See 669 F.Supp. at 591. In addition to relying on the contract language itself, Judge Conner cited other factors to support his conclusion. First, he concluded that PP & L's conduct in litigating these lawsuits for nearly three months before seeking arbitration indicated that the utility had not originally understood the language of Paragraph 4N as providing a broad right of arbitration. Id. at 591-92. Judge Conner observed that "PP & L's attorneys essentially conceded in a conference before this Court that the independent tax counsel had no role in this litigation when they asked for leave to file a motion for summary judgment on the merits of the three lawsuits." Id. at 591. Second, Judge Conner held that the affidavits supplied by the plaintiffs further indicated that the parties had never intended the clause regarding the appointment of an independent tax counsel to reach disputes as to the utility's good faith. Id. at 592. Judge Conner concluded that "it is clear that the parties to the[se] ... Agreement[s] never intended that the claims in these lawsuits be submitted to arbitration." Id.
 
 
 19
 After we heard oral argument on the merits of this appeal, the Supreme Court entered its decision in Gulfstream Aerospace Corp. v. Mayacamas Corp., --- U.S. ----, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988). In that decision, the Court overruled the precedents on which the so-called Enelow-Ettelson doctrine had been based, see id. at ----, 108 S.Ct. at ---, thereby eliminating the jurisdictional vehicle through which we traditionally had heard appeals from interlocutory orders granting or denying stays pending arbitration, see, e.g., Gilmore v. Shearson/American Express, Inc., 811 F.2d 108, 110-11 (2d Cir.1987) (citing Ettelson v. Metropolitan Life Ins. Co., 317 U.S. 188, 63 S.Ct. 163, 87 L.Ed.176 (1942); Enelow v. New York Life Ins. Co., 293 U.S. 379, 55 S.Ct. 310, 79 L.Ed. 440 (1935)). We therefore requested additional briefing from the parties regarding our appellate jurisdiction. Subsequently, we dismissed the appeal, but remanded the case to the district court, directing Judge Conner to consider whether, in the unique circumstances of this case, the interlocutory order at issue should be certified for immediate appeal pursuant to 28 U.S.C. Sec. 1292(b). See McDonnell Douglas I, at 762, 764-65. In the interests of judicial economy, we directed that any such certification should be referred back to this panel. See id. at 765. In a subsequent Opinion and Order dated July 29, 1988, Judge Conner did indeed certify the question for appeal. We now accept that certification and proceed to a discussion of the merits.
 
 DISCUSSION
 
 20
 The Federal Arbitration Act, 9 U.S.C. Sec. 1 et seq., "reflects a [congressional] recognition of 'the desirability of arbitration as an alternative to the complications of litigation.' " Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 844 (2d Cir.1987) (quoting Wilko v. Swan, 346 U.S. 427, 431, 74 S.Ct. 182, 184-85, 98 L.Ed. 268 (1953)). Thus, the Act is a statement of " 'a liberal federal policy favoring arbitration agreements....' " Id. (quoting Moses H. Cone Memorial Hosp. v. Mercury Construction Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983)). Section 3 of the Act provides for a stay of legal proceedings when a dispute before a court is arbitrable under a contract or agreement, see 9 U.S.C. Sec. 3, and section 4 directs federal courts to order compulsory arbitration "if there has been a 'failure, neglect, or refusal' of any party to honor an agreement to arbitrate." Scherk v. Alberto-Culver Co., 417 U.S. 506, 511, 94 S.Ct. 2449, 2453, 41 L.Ed.2d 270 (1974) (quoting 9 U.S.C. Sec. 4). See also Genesco, 815 F.2d at 844. " '[T]he Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.' " Id. (quoting Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 218, 105 S.Ct. 1238, 1241, 84 L.Ed.2d 158 (1985)).
 
 
 21
 In keeping with these policies and statutory mandates, a court asked to stay proceedings pending compulsory arbitration under the Act must engage in a four-step inquiry:
 
 
 22
 [F]irst, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then determine whether to stay the balance of the proceedings pending arbitration.
 
 
 23
 Id. (citations omitted). See also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626-28, 105 S.Ct. 3346, 3354-55, 87 L.Ed.2d 444 (1985) (discussing similar standards). Because this case involves only one allegedly arbitrable issue--one that does not implicate federal statutory rights--we need only engage in the first two steps of the inquiry mandated by Genesco.[1]
 
 I.
 
 24
 The first question we must address is whether the language in Paragraph 4N calling for the appointment of an independent tax counsel does indeed constitute an enforceable arbitration clause. We believe that the language clearly manifests an intention by the parties to submit certain disputes to a specified third party for binding resolution. It is, in our estimation, irrelevant that the contract language in question does not employ the word "arbitration" as such. Rather, what is important is that the parties clearly intended to submit some disputes to their " 'chosen instrument for the definitive settlement of [certain] grievances under the Agreement....' " International Longshoremen's Ass'n v. Hellenic Lines, Ltd., 549 F.Supp. 435, 437 (S.D.N.Y.1982) (holding that binding review by a designated third party is arbitration even if not denominated as such in the contract) (quoting General Drivers, Warehousemen & Helpers, Local Union No. 89 v. Riss & Co., 372 U.S. 517, 519, 83 S.Ct. 789, 791, 9 L.Ed.2d 918 (1963)). See also Wasyl, Inc. v. First Boston Corp., 813 F.2d 1579, 1580-82 (9th Cir.1987) (finding an enforceable agreement to arbitrate when the parties had simply agreed that certain disputed issues "shall be established by three independent appraisers"); Butler Products Co. v. Unistrut Corp., 367 F.2d 733, 734-36 (7th Cir.1966) (treating as an arbitration clause contract language providing that "the items in dispute shall be submitted for determination to the firm of Peat, Marwick, Mitchell & Co."); Mencher v. B. & S. Abeles & Kahn, 274 A.D. 585, 84 N.Y.S.2d 718, 721 (1st Dep't 1948) (holding that the terms "arbitration" or "arbitrate" need not be used as long as binding review by a third party is clearly "the intention of the parties"). Similarly, it is not dispositive that the Agreements fail to term the independent tax counsel's conclusions "final" or "binding." Again, the parties' intent in that regard seems clear from the language of their contract. The Agreements expressly provide that any obligations arising from indemnification or redemption under Paragraph 4N would not be binding "until and only to the extent that [any] dispute is resolved [by the independent tax counsel]." We therefore believe that this language in Paragraph 4N represents an enforceable arbitration clause.
 
 
 25
 We do not believe that our construction of the language in question here is inconsistent with Judge Conner's ruling that the parties' Agreements lacked "a clear, explicit statement" of an intent to submit this particular dispute to arbitration. Although Judge Conner did not engage in the step-by-step inquiry articulated in Genesco, we believe that in relying on the language from Fuller v. Guthrie, 565 F.2d at 261, he was interpreting the parties' intentions as to the scope of an existing arbitration clause. Therefore, we are not disturbing any factual conclusions reached by the district court. Rather, we also must consider the intended scope of the clause, a legal question that we review here de novo. See, e.g., Genesco, 815 F.2d at 846.
 
 II.
 
 26
 Once it is determined that the parties to a contract have created an enforceable arbitration clause, then the policies inherent in the Federal Arbitration Act dictate that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses H. Cone Memorial Hosp., 460 U.S. at 24-25, 105 S.Ct. at 941. See also Mitsubishi Motors, 473 U.S. at 626, 105 S.Ct. at 3354; S.A. Mineracao da Trindade-Samitri v. Utah Int'l, Inc., 745 F.2d 190, 194-95 (2d Cir.1984). Although "[t]he scope of an arbitration clause, like any contract provision, is a question of the intent of the parties," id. at 193 (citing Necchi S.p.A. v. Necchi Sewing Machine Sales Corp., 348 F.2d 693, 696 (2d Cir.1965), cert. denied, 383 U.S. 909, 86 S.Ct. 892, 15 L.Ed.2d 664 (1966)), the strong federal presumption in favor of arbitration dictates that doubts as to arbitrability should be resolved in favor of coverage, id. at 194. See also Wire Service Guild v. United Press Int'l, 623 F.2d 257, 260 (2d Cir.1980). However, it is equally clear that "federal policy alone cannot be enough to extend the application of an arbitration clause far beyond its intended scope." Fuller v. Guthrie, 565 F.2d at 261. The purpose of the Federal Arbitration Act "was to make arbitration agreements as enforceable as other contracts, but not more so." Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404 n. 12, 87 S.Ct. 1801, 1806 n. 12, 18 L.Ed.2d 1270 (1967) (emphasis added). Therefore, while keeping in mind the federal policy favoring arbitration, we must carefully consider whether the parties to these Agreements intended that disputes as to the utility's good faith in seeking redemption under Paragraph 4N would be submitted for binding arbitration to an independent tax counsel.
 
 
 27
 In construing arbitration clauses, courts have at times distinguished between "broad" clauses that purport to refer all disputes arising out of a contract to arbitration and "narrow" clauses that limit arbitration to specific types of disputes. See, e.g., Associated Brick Mason Contractors of Greater New York, Inc. v. Harrington, 820 F.2d 31, 35 (2d Cir.1987); Prudential Lines, Inc. v. Exxon Corp., 704 F.2d 59, 63-64 (2d Cir.1983); Rochdale Village, Inc. v. Public Service Employees Union, Local No. 80, 605 F.2d 1290, 1295 (2d Cir.1979); Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co., 767 F.2d 1140, 1144-45 & n. 10 (5th Cir.1985). If a court concludes that a clause is a broad one, then it will order arbitration and any subsequent construction of the contract and of the parties' rights and obligations under it are within the jurisdiction of the arbitrator. See Rochdale Village, 605 F.2d at 1295. See also International Union of Operating Engineers, Local 150 v. Flair Builders, Inc., 406 U.S. 487, 491-92, 92 S.Ct. 1710, 1712-13, 32 L.Ed.2d 248 (1972); Associated Brick Mason Contractors, 820 F.2d at 35. Moreover, as the Supreme Court has noted, the strong federal presumption in favor of arbitrability applies with greater force when an arbitration clause is a broad one. See AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986). With narrower clauses, however, a court considering the appropriate range of arbitrable issues must "consider whether the [question at] issue is on its face within the purview of the clause." Rochdale Village, 605 F.2d at 1295. See also Prudential Lines, 704 F.2d at 64; McAllister Bros. v. A & S Transp. Co., 621 F.2d 519, 522 (2d Cir.1980). In determining whether a particular dispute falls within the scope of a narrow and specific arbitration clause, "[t]he tone of the clause as a whole must be considered." Prudential Lines, 704 F.2d at 64.
 
 
 28
 We conclude that the clause at issue here is a narrow one. It is not the sort of broad clause in which parties agree "to submit to arbitration disputes 'of any nature or character,' or simply 'any and all disputes,' " Rochdale Village, 605 F.2d at 1295. Rather, its effect is limited to the context of Paragraph 4N and the circumstances that might surround the utility's decision to seek redemption pursuant to that Paragraph. Therefore, in construing the scope of the clause, we must be careful to carry out the specific and limited intent of the parties. See, e.g., S.A. Mineracao, 745 F.2d at 193; Fuller, 565 F.2d at 261. Although we must be mindful of the federal presumption in favor of arbitration, we cannot allow that presumption to have the strong effect here that it would have if we were construing a broad arbitration clause. See AT & T Technologies, 475 U.S. at 650, 106 S.Ct. at 1419. Cf. Fuller, 565 F.2d at 261.
 
 
 29
 We agree with the district court that the parties to these Agreements did not intend this arbitration clause to reach disputes as to the utility's good faith. In so concluding, we rely on the plain language of the arbitral clause, its import within the context of Paragraph 4N, and on some of the additional factors cited by the district court. First, we find it significant that the parties agreed to refer their disputes to a tax counsel rather than to an arbitrator of more general expertise. The specific and limited intent indicated by that choice is evident throughout the rest of the clause. The clause takes effect if the utility "should disagree with any [shareholder's] computation of the amount of the required indemnity payment or refund thereof ... or if any [shareholder] should disagree with [the] good faith determination of the [utility] that there is substantial risk [of indemnification]." Although the latter half of that clause could be read literally to encompass all aspects of PP & L's good faith determination, the overall context of the passage indicates that it applies only to those aspects of the utility's determination that rest on PP & L's interpretation of tax law in determining the scope of its potential liability to the shareholders. In fact, the next segment of the clause provides that no obligations shall arise as to "the disputed portion of such amount" until any dispute is resolved by the independent tax counsel. This supports our conclusion that the effect of the clause should be limited to tax law questions and to the computation of the amount of any indemnity payments that the utility might owe its shareholders as a result of changes in the tax law. Had the parties intended to submit all issues regarding the utility's good faith to an arbitrator, we do not believe that they would have chosen a tax counsel.
 
 
 30
 Second, we agree with the district court that this conclusion is supported by the affidavits filed by the shareholders. Those affidavits were filed by a GEICO Corp. official involved in the negotiations leading to the contract at issue here, an attorney representing several of the shareholders in this litigation, and two other attorneys from the same law firm who had worked to develop similar clauses in similar transactions. Essentially, they all indicate that this arbitration clause and similar ones being used by other utilities were only intended to reach tax issues and not broad questions of good faith. Although we do not find the post hoc assertions of a litigating attorney to be especially probative in determining the original import of a disputed contract clause, we do find some support for our conclusions in the assertions of the GEICO Corp. official and the other attorneys familiar with industry practice. Furthermore, to the extent that these statements purport to represent the parties' understanding of their contract before its execution, we do not believe that they are inadmissible under the parol evidence rule. Such extrinsic evidence is always admissible to aid in the interpretation of a contract that is ambiguous or susceptible of two equally reasonable constructions. See Asheville Mica Co. v. Commodity Credit Corp., 335 F.2d 768, 770 (2d Cir.1964) (Marshall, J.). See also Schering Corp. v. Home Ins. Co., 712 F.2d 4, 9 (2d Cir.1983). We also believe, as the district court apparently did, that it is significant that PP & L did not contest the shareholders' narrow interpretation of the arbitration clause during the pretrial conference before Judge Conner.
 
 
 31
 Finally, we note one factor upon which we do not rely in reaching our conclusion as to the scope of this arbitration clause. In denying PP & L's motion, the district court relied on the utility's conduct in litigating these lawsuits for nearly three months before seeking arbitration. This reliance could be viewed in one of two ways. Either the district court viewed the utility's conduct as a waiver of an existing right to arbitration or as evidence of PP & L's original intent with respect to the clause. We do not believe that the utility's conduct could have constituted a waiver, particularly in light of the strong federal presumption against the waiver of such rights. See, e.g., Moses H. Cone Memorial Hosp., 460 U.S. at 24-25, 103 S.Ct. at 941; Rush v. Oppenheimer & Co., 779 F.2d 885, 887 (2d Cir.1985). Although the litigation of substantial issues going to the merits may constitute a waiver of arbitration, see id., we do not believe that such conduct occurred here. PP & L merely responded to the plaintiffs' complaints, participated in some discovery, and spoke of the possibility of seeking summary judgment. We have held that such conduct is insufficient to constitute a waiver. See id. at 887-90. Moreover, the shareholders were not unduly prejudiced by the motion seeking arbitration, see id. at 887, particularly not when it so closely followed the amendment of their complaints at the direction of the district court.
 
 
 32
 We also do not believe that the district court could properly view the utility's conduct as evidence of a pre-existing intent with respect to the disputed clause. In denying PP & L's motion, Judge Conner ruled that the shareholders' original complaints were sufficient to put the utility on notice that its exercise of good faith under Paragraph 4N was being challenged. We believe, however, that this conclusion is somewhat inconsistent with the district court's earlier decision to grant the plaintiffs additional time to amend their complaints. In allowing the shareholders to clarify the nature of their allegations regarding PP & L's good faith, the district court implicitly conceded that the original complaints were not sufficiently clear on this point. Although those complaints generally described the utility's redemption as "wrongful" and in "bad faith," we believe that the gist of the complaints was that the shareholders' attempted waivers had effectively negated any power of redemption that the utility might have had under Paragraph 4N. The complaints did not directly allege that the utility's determination of a substantial risk of indemnification failed to satisfy the good faith standard set out in that Paragraph. Given that the utility's demand for arbitration immediately followed a court-sanctioned amendment of the original complaints, we do not believe that PP & L's previous conduct can be seen as probative of its earlier intent regarding arbitration.
 
 CONCLUSION
 
 33
 For all of the foregoing reasons, we affirm the order of the district court denying the defendant-appellant's motion for a stay of proceedings pending compelled arbitration.
 
 
 
 [1]
 Because only the issue of arbitration is before us, we need not reach the merits of the parties' other arguments regarding the utility's right to redeem under the circumstances present here. We do note, however, that we have discussed very similar claims in a case involving parties to a preferred share purchase agreement containing virtually identical language. See American Home Assurance Co. v. Baltimore Gas & Electric Co., 845 F.2d 48 (2d Cir.1988)