**MONTGOMERY MAILERS' UNION NO. 127, Plaintiff-Appellee,**

v.

**The ADVERTISER COMPANY, Defendant-Appellant.**

No. 86–7503.

United States Court of Appeals, Eleventh Circuit.

Sept. 15, 1987.

John M. Capron, Fisher & Phillips, Atlanta, Ga., M. Roland Nachman, Balch & Bingham, Montgomery, Ala., defendant-appellant.

Robert H. Stropp, Stropp & Nakamura, Birmingham, Ala., for plaintiff-appellee.

Before HILL and JOHNSON, Circuit Judges, and HENLEY,[*] Senior Circuit Judge.

HENLEY, Senior Circuit Judge:

Appellee Montgomery Mailers' Union No. 127 (Union) commenced this action under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, to compel appellation.

[*] Honorable J. Smith Henley, Senior U.S. Circuit Judge for the Eighth Circuit sitting by designa-

lant The Advertiser Company (Company) to arbitrate three grievances brought by the Union pursuant to the parties' collective bargaining agreement. On cross-motions for summary judgment the district court enjoined the Company from refusing to arbitrate. This appeal followed. We affirm in part, reverse in part and remand for further proceedings.

## I

The term of the parties' collective bargaining agreement was from January 1, 1983 to December 31, 1985. The agreement also contained provisions for automatic renewal, renegotiation of the agreement and extension of the agreement during renegotiation.[1] By a letter dated October 25, 1985 the Union submitted a proposal for a new agreement. Accordingly, neither party contends that the year-to-year renewal provision of the old agreement applies. The Company asked for and received an extension of time in which to submit its counter-proposal. On November 22, 1985 the Company notified the Union in a letter that it had tentatively decided to subcontract the work performed by the employees under the collective bargaining agreement. Therefore, the Company "propose[d] simply to maintain the *status quo* until such time as the work is subcontracted and the bargaining unit eliminated."

On December 4, 1985 and January 13, 1986 representatives of the Union and the Company met in bargaining sessions. At both meetings the Company reiterated its decision to subcontract and the sessions revolved around that proposition. The parties again met on January 31, 1986 at which time the Union's attorney was present. The Company again indicated its intention to subcontract because it would realize substantial financial savings by doing so.

The following week the Union wrote to "accept[ ] The Advertiser Company's counter-proposal offering the existing contract. See paragraph [2, *supra* footnote 1 of this opinion] of the parties' current collective bargaining agreement...." The Union's position was that the Company's November 22 letter was not a "counter-proposal" and that under the terms of the agreement the Company is construed to have offered the existing contract as its counter-proposal. The Company, however, acknowledged that Union's acceptance as acquiescing in the Company's decision to subcontract.

The parties met at further bargaining sessions on February 26 and 27, 1986. At these sessions the parties further discussed the financial impact of the Company's decision to subcontract. On April 23, 1986 the parties had a final meeting. The Union argued that the Company had failed to submit a counter-proposal and the existing collective bargaining agreement was therefore proposed. The Company disagreed and continued to offer to negotiate on its decision to subcontract. The Union declined to continue bargaining. The following day the Company notified the Union of its intention to proceed with subcontracting.

The parties' collective bargaining agreement contained provisions for arbitration of disputes. The proceedings here are laid and battle joined under Section 15 of the agreement.[2] On April 25, 1986 the Union

---

1. The relevant portion of the contract reads:
   WITNESSETH: It is agreed that this contract shall be in effect through December 31, 1985, and shall continue in effect for such reasonable time thereafter as may be required for negotiations of a new agreement.
   Should either party desire to negotiate for changes in any or all of the provisions of this contract upon its expiration date, written notice to that effect must be given to the other party at least sixty days before date of expiration, together with written statement in detail of the changes desired. Respondent party shall have twenty days in which to file a counter-proposal. Failure to file a counter-proposal shall be construed as offering the existing contract as the party's counter-proposal. If no opening is given as designated above, this agreement shall run from year to year and can be changed only through negotiations started by written notice of one of the parties to the other as described above at least sixty days prior to December 31st of the succeeding year.

2. Section 15 provides in part:
   A Joint Standing Committee ... shall be [established].... To this committee shall be referred all questions which may arise as to the construction of any clause of this con-

invoked the arbitration clause to determine whether the Company's November 22 letter was a "counter-proposal."[3] The Company expressed its willingness to resume negotiations, but it refused to arbitrate. On May 1, 1986 the Company advised the Union that it was going ahead with its decision to subcontract and would be discharging five bargaining unit employees. On May 7, 1986 the Union submitted its third grievance demanding that the company maintain the status quo until after arbitration. On May 9, 1986 the Company began subcontracting. The five employees were discharged and one was immediately reemployed in another position.

The Union then commenced this action to compel arbitration. 29 U.S.C. § 185. On cross-motions for summary judgment the district court ordered the parties to proceed to arbitration. This appeal followed. During the pendency of this appeal arbitration was had and the arbitrator resolved all material issues in favor of the Union.

## II

■ The only issue to be resolved in this appeal is whether the district court properly compelled arbitration. In analyzing that decision we are not to concern ourselves with weighing the merits of the underlying grievance. *Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960). The *Steelworkers Trilogy*[4] establishes that " 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' " *AT & T Technologies, Inc.*, 106 S.Ct. at 1418 (quoting *Warrior & Gulf*, 363 U.S. at 582, 80 S.Ct. at 1353). The second *Steelworkers Trilogy* principle follows from the first—arbitrability is for judicial determination unless the parties unequivocally provide otherwise. *AT & T Technologies, Inc.*, 106 S.Ct. at 1418. Finally, in determining arbitrability there is a presumption in favor of arbitration. *Id.* at 1419.

■ The Company contends that it should not have been compelled to arbitrate because the Union's request for arbitration was made after the termination of the collective bargaining agreement.[5] Expiration of the collective bargaining agreement does not automatically end the parties' contract rights including that of arbitration. "[T]he parties' obligations under their arbitration clause survive contract termination when the dispute [is] over an obligation arguably created by the expired contract." *Nolde Brothers, Inc. v. Local No. 358, Bakery &*

---

tract, or violation thereof.... All decisions of the Joint Standing Committee shall be final ... and it shall require a unanimous vote ... to make a decision.

Should the Joint Standing Committee be unable to agree ... then it shall refer the matter to a board of arbitration.... The decision of this board shall be final and binding upon both parties. If any controversy, except in discharge cases, arises to the interpretation or enforcement of this agreement, the conditions prevailing prior to the dispute shall be maintained until the controversy is disposed of as provided herein.

3. In this same grievance the Union also requested arbitration on the terms of the Company's counter-proposal if the Company is deemed to have offered the existing contract. In a separate grievance submitted at the same time the Union demanded arbitration on whether the Company could subcontract under whatever agreement was in existence; if a reasonable time for negotiating a new contract had passed, thus resulting in a lapse of the old collective bargaining agreement; and whether the phrase "negotiation[] of a new agreement" implied that the bargaining unit could not be eliminated.

4. This is the collective name given to a series of three Supreme Court cases decided over a quarter century ago which are still considered the foundation of any decision involving arbitration imposed by collective bargaining agreements. *See AT & T Technologies, Inc. v. Communication Workers of America*, 475 U.S. 643, 106 S.Ct. 1415, 1418–19, 89 L.Ed.2d 648 (1986). The *Trilogy* consists of *Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

5. The collective bargaining agreement provided that it was to continue in effect beyond December 31, 1985 for a reasonable time for negotiation of a new agreement. For the purpose of this appeal it is unnecessary for us to determine the duration of the collective bargaining agreement.

*Confectionery Workers Union,* 430 U.S. 243, 252, 97 S.Ct. 1067, 1072, 51 L.Ed.2d 300 (1977). When the manner of contract termination or renewal is dictated by a provision in the collective bargaining agreement, and the agreement contains a broad arbitration clause, the appellate courts have compelled arbitration. *Sheet Metal Workers Local 57 Welfare Fund v. Tampa Sheet Metal Co.,* 786 F.2d 1459, 1461 (11th Cir.1986); *International Brotherhood of Electrical Workers, Local 1228 v. Freedom WLNE–TV, Inc.,* 760 F.2d 8, 11 (1st Cir.1985); *Rochdale Village, Inc. v. Public Service Employees Union, Local No. 80,* 605 F.2d 1290, 1295–96 (2d Cir.1979); *Local Union No. 4, International Brotherhood of Electrical Workers v. Radio Thirteen-Eighty, Inc.,* 469 F.2d 610, 614 (8th Cir. 1972). *See contra Office & Professional Employees International Union Local 42 v. United Automobile, Aerospace & Agricultural Implement Workers of America, Westside Local No. 174,* 524 F.2d 1316, 1317 (6th Cir.1975) (per curiam).

▇ Accordingly, in determining whether the district court erred in compelling arbitration under the broad arbitration clause in the parties' collective bargaining agreement, we must confine our inquiry to "ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract." *American Manufacturing Co.,* 363 U.S. at 568, 80 S.Ct. at 1346. We therefore turn to the individual issues raised in the Union's grievances to determine whether they are arbitrable.

### III

▇ The Union's first grievance (Exhibit B attached to its complaint) seeks arbitration of the question whether the Company's November 22, 1985 letter is a counter-proposal. Assuming that the letter is not a counter-proposal, the Union further requests determination of the term of the existing contract the Company is deemed to have submitted as a counter-proposal. This mechanism of proposal followed by counter-proposal is established by the collective bargaining agreement and the dis-

trict court properly ordered arbitration of the issues presented in the Union's first grievance. *See Rochdale Village, Inc.,* 605 F.2d at 1296 (whether an employer had complied with the contract termination provision of a collective bargaining agreement is arbitrable).

### IV

The Union's second grievance is more complex. This grievance is divided into two parts. The first portion contends that the Company's decision to subcontract is contrary to the parties' "current collective bargaining agreement." The Union concedes that this portion of the second grievance is dependent on a favorable resolution of the first grievance. Thus, the Union contends that the proposal/counter-proposal mechanism in the old contract has resulted in the formation of a new collective bargaining agreement. The new agreement would be a renewal of the old agreement, assuming a favorable result in the Union's first grievance, because the Company is deemed to have offered the existing agreement which, the argument continues, *the Union accepted.*

The Union's reference in its brief to acceptance is terse. "There is no dispute that the Union *accepted* the offer by its February 7, 1986 letter of acceptance." (Emphasis by the Union.) The Union's position on the first part of the second grievance assumes that its letter of February 7 is undisputedly acceptance of the offer the Company is deemed to have made (the subject of the first grievance). We must disagree. Certainly the Union attempted to accept an offer; however, an offer may be withdrawn prior to acceptance. "An offeree's power of acceptance is terminated when the offeree receives from the offeror a manifestation of an intention not to enter into the proposed contract." *Restatement (Second) of Contracts* § 42 (1981).

Assuming the Company's November 22, 1985 letter to be ineffective as a counter-proposal, the Company is deemed to have offered the existing contract as its counter-proposal in late November. The Union's letter of acceptance was mailed February

7, 1986. In the intervening period the two sides met at bargaining sessions three separate times. The primary focus of those sessions was the Company's decision to subcontract and suggestion that the status quo be maintained until subcontracting was accomplished. It is difficult to imagine a clearer manifestation of the Company's intent *not* to renew the existing contract.[6] Having determined that acceptance is not undisputed, the salient question becomes who determines the dispute, the court or the arbitrator?

■ Once again, the focus of the inquiry is whether the claim is "on its face governed by the contract." *American Manufacturing Co.*, 363 U.S. at 568, 80 S.Ct. at 1346. The necessity of a counter-proposal, the period in which it is to be made, and the effect of not making one are all issues governed by the contract. The collective bargaining agreement is silent on the time in which a proposal is to be accepted, the manner of acceptance or any other aspect of acceptance. Thus, the question whether the intervening negotiations terminated the Union's power of acceptance is not on its face governed by the contract. *Id. Rochdale Village* and its kin are distinguishable because those cases involved the operation of a specific termination clause in the contract. *See Freedom WLNE–TV*, 760 F.2d at 11 (whether an open-ended duration clause continued the contract is arbitrable because it involves "substantive provisions of the contract."); *Rochdale Village*, 605 F.2d at 1296 (contract clause provided that the agreement may be terminated by notification within a particular time period; contention that employer's letter was timely and satisfied the notification provision is arbitrable); *Radio Thirteen-Eighty*, 469 F.2d at 613 (interpretation of a specific contract clause).

The parties' broad arbitration clause is not limitless. The presumption favoring arbitration, *AT & T Technologies*, 106 S.Ct. at 1419, cannot swallow the underlying

foundation for arbitration: the dispute to be arbitrated must "involve construction of the substantive provisions of the contract." *American Manufacturing Co.*, 363 U.S. at 571, 80 S.Ct. at 1365 (Brennan, J., concurring). The Supreme Court has recognized that an arbitrator's power is derived from the contract and is limited to obligations created by the contract.

> The willingness of parties to enter into agreements that provide for arbitration of specified disputes would be "drastically reduced," however, if a labor arbitrator had the "power to determine his own jurisdiction...." Were this the applicable rule, an arbitrator would not be constrained to resolve only those disputes that the parties have agreed in advance to settle by arbitration, but instead, would be empowered "to impose *obligations outside the contract* limited only by his understanding and conscience." This result undercuts the longstanding federal policy of promoting industrial harmony through the use of collective-bargaining agreements, and is antithetical to the function of a collective-bargaining agreement as setting out the rights and duties of the parties.

*AT & T Technologies*, 106 S.Ct. at 1419–20 (quoting Cox, *Reflections Upon Labor Arbitration*, 72 Harv.L.Rev. 1482, 1509 (1959)) (emphasis supplied).

The Union attempts to sidestep the requirement that the dispute concerns an obligation created by the contract by asserting that there is no dispute concerning the Union's acceptance. We conclude otherwise. Unlike the dispute concerning the counter-proposal (offer), the collective bargaining agreement creates no obligations concerning acceptance. There are no terms or provisions to be construed regarding acceptance. There simply is no dispute as to the construction of a clause of the contract with regard to acceptance because no such clause exists. This issue is beyond the scope of the arbitration clause. While the arbitrator may have some greater ex-

---

**6.** This is an issue for the district court in the first instance. Our discussion is intended to show only that a colorable argument exists that even if the Company is deemed to have offered

the existing contract, the Union's power to accept the offer may have terminated before its February 7, 1986 letter was sent.

pertise which justifies a predisposition toward arbitration in the gritty world of labor disputes involving obligations created by the collective bargaining agreement, this is not true in the case of a dispute of contract law unmodified by a clause of the collective bargaining agreement. *See International Union of Operating Engineers, Local 150 v. Flair Builders, Inc.,* 406 U.S. 487, 497, 92 S.Ct. 1710, 1715, 32 L.Ed.2d 248 (1972) (Powell, J., dissenting). Therefore, to the extent the district court ordered arbitration of the dispute involving acceptance, that decision is reversed.

## V

The second half of the Union's second grievance concerns the phrase, "this contract ... shall continue in effect for such reasonable time ... as may be required for negotiation of a new agreement." The Union contends that this creates a requirement that the Company negotiate a new collective bargaining agreement and cannot eliminate the bargaining unit by subcontracting.

The Union reads the absence of a termination clause coupled with the existence of a renegotiation clause to foreclose the possibility of terminating the collective bargaining agreement. Thus, the Union attempts to reform the collective bargaining agreement in the guise of "construing a clause" of the contract through arbitration. The Union's position is contrary to fundamental principles of law, our established national labor relations policy and the intent of Congress expressed in the Labor Management Relations Act of 1947. *See Local Union No. 28, International Brotherhood of Electrical Workers v. Maryland Chapter National Electrical Contractors Association, Inc.,* 194 F.Supp. 494, 501–02 (D.Md.1961).

■ Labor contracts of indeterminate duration or ones that do not provide a manner of termination are terminable at will. *Communications Workers of America v. Southwestern Bell Telephone Co.,* 713 F.2d 1118, 1123 n. 4 (5th Cir.1983); *Boeing Airplane Co. v. N.L.R.B.,* 174 F.2d 988, 991 (D.C.Cir.1949); *Trustees of the*

*Atlanta Iron Workers Local 387 Pension Fund v. Southern Stress Wire Corp.,* 509 F.Supp. 1097, 1105 n. 12 (N.D.Ga.1981), *rev'd on other grounds,* 724 F.2d 1458 (11th Cir.1983). The Union stands this principle of contract law on its head, converting an indefinite contract into a perpetual contract. The Union counters, however, that the Company is merely obligated to enter into a new collective bargaining agreement and the new agreement could provide for a manner of termination. Given the Company's desire to subcontract, we doubt that the Union would be eager to enter into such an agreement when it could perpetuate the existing contract by continuing negotiations but never reaching an agreement.

"It is inconceivable that either party, wishing to avoid a breakdown of labor-management relations would have intended that the contract continue in force unless efforts to change the contract were successful.... The side *not* desiring a change could refuse to agree, within the confines of the Labor-Management Relations Act's proscription against refusals to bargain. Each side could stand entrenched knowing the contract would continue as it was. The side desiring to alter the terms or conditions of the relationship would never have a prayer of success."

*Kaufman and Broad Home Systems, Inc. v. International Brotherhood of Firemen and Oilers,* 607 F.2d 1104, 1110 (5th Cir. 1979) (quoting *Local 35, United Association of Journeymen v. Slayden,* 91 L.R. R.M. (BNA) 2272, 2273–74 (N.D.Cal.1975)).

■ The *Slayden* court further concluded that silence as to how the new terms were to be arrived at (*e.g.,* negotiation or arbitration) "inescapably indicates an absence of intention to continue the contract in force beyond the expiration[ ] once notice of a desire to ·change or terminate the contract is given." *Slayden,* 91 L.R.R.M. (BNA) at 2274. The present contract expressly provides that any new agreement is to be arrived at through *negotiation.* Therefore, it is clear both that the formation of any new agreement is beyond the

scope of the arbitration clause and that the agreement provides no mechanism to avoid the deadlock envisioned in *Slayden* should the Company be required to enter into a new contract.

The national labor relations policy as embodied in the statutes and enunciated by the Supreme Court also militates against arbitrability of this issue. "[A]t the present statutory stage of our national labor relations policy, the two factors—necessity for good-faith bargaining between parties, and the availability of economic pressure devices to each to make the other party incline to agree on one's terms—exist side by side." *N.L.R.B. v. Insurance Agents' International Union,* 361 U.S. 477, 489, 80 S.Ct. 419, 427, 4 L.Ed.2d 454 (1960); *see also H.K. Porter Co. v. N.L.R.B.,* 397 U.S. 99, 108, 90 S.Ct. 821, 826, 25 L.Ed.2d 146 (1970) (freedom of contract is a fundamental policy embodied in the National Labor Relations Act). The Union attempts to alter the nature of this relationship by failing to recognize the fundamental difference between grievance and interest arbitration.[7] The Union's claim requires the formation of a new contract and is cognizable only in the context of interest arbitration. Because interest arbitration is disfavored, *see Sheet Metal Workers Local 57,* 786 F.2d at 1461 (refusing to extend interest arbitration beyond life of the first contract), we will not construe an otherwise broad arbitration clause to encompass interest arbitration. We conclude, therefore, that the district court erred in compelling arbitration on the second portion of the Union's second grievance and we reverse that portion of the district court's order.

### VI

■ The Union's third and final grievance concerns a clause in the collective bargaining agreement requiring the main-

tenance of the prevailing conditions during a dispute. This is plainly an obligation created by the agreement which falls within the scope of the arbitration provision. Accordingly, the district court did not err in compelling arbitration of the third grievance.

### VII

The decision of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.[8]

---

7. At times, two categories of labor arbitration have been distinguished. The first is grievance arbitration which concerns disputes over the terms of existing contracts. The other is "interest" or "new contract" arbitration which allows for arbitration of the terms of a new contract. *See N.L.R.B. v. Columbus Printing Pressmen & Assistants' Union No. 252,* 543 F.2d 1161, 1163 n. 4 (5th Cir.1976).

8. The Union's motion to supplement the record on appeal to include the arbitration award arrived at during the pendency of this appeal is granted only to the extent necessary to provide a complete procedural background of this case. We express no other opinion regarding that award.