The NEWSPAPER GUILD OF SALEM, Local 105 of the Newspaper Guild, Plaintiff

v.

OTTAWAY NEWSPAPERS, INC., The Salem News Publishing Company, Inc., and Essex County Newspapers, Defendants.

Civ. A. No. 95–11337–EFH.

United States District Court, D. Massachusetts.

July 24, 1995.

---

Ruth A. Bourquin, Angoff, Goldman, Manning, Pyle, Wanger & Hiatt, P.C., Boston, MA, for plaintiff.

Richard A. Perras, Timothy P. Van Dyck, Edwards & Angell, Boston, MA, for defendants.

## MEMORANDUM AND ORDER

HARRINGTON, District Judge.

The Plaintiff, The Newspaper Guild of Salem, Local 105 of the Newspaper Guild (the "Guild" or the "Union"), seeks a preliminary and permanent injunction. Plaintiff asks this Court: (1) to compel the defendants, who are the Publisher of *The Salem Evening News*, to submit grievances arising under the collective bargaining agreement with the plaintiff to arbitration; and (2) to enjoin the defendants from laying off Guild members in violation of Article 4.5 [1] of the collective bargaining agreement, pending resolution of the Guild's grievance concerning the Publisher's obligation to bargain a successor contract and to honor the terms of the collective bargaining agreement until those negotiations are completed.

Essex County Newspapers (hereinafter "ECN") publishes *The Beverly Times* and *The Peabody Times,* daily newspapers, from its plant in Beverly, Massachusetts. Effective March 15, 1995, ECN completed the acquisition of *The Salem Evening News,* a daily newspaper, published in Salem, Massachusetts, by the Salem News Publishing Company. This acquisition was completed through the merger of the prior owner, the Salem News Publishing Company, into the Salem News Publishing Company, Inc., a wholly-owned subsidiary of Ottaway Newspapers, Inc.

ECN is consolidating *The Beverly Times, The Peabody Times* and *The Salem Evening News* into one publication to be called *The Salem Evening News* to be published from ECN's Beverly facility. ECN's Beverly facility is less than five miles from the Salem facility. The ability to consolidate these papers was the principal reason for ECN's acquisition of *The Salem Evening News.*

ECN's Beverly plant is much more modern than the current Salem plant and is located with easy access to Route 128. There are obvious efficiencies presented by consolidating into the more modern facility with far better access for distribution of the newspaper.

Consolidating these operations will require reduction of the work force to avoid duplication. For example, a single integrated accounting department will mean that fewer

---

1. There shall be no dismissal of employees in the Guild jurisdiction for economy or as a result of new or modified processes or equipment.

overall accounting employees are needed, likewise with circulation and advertising. Also, there is considerable overlap in news coverage with reporters from *The Beverly Times* and *Salem Evening News* now covering many of the same news events. The consolidated operation will need fewer reporters, copy desk editors, etc., to provide coverage of the combined circulation areas.

The plaintiff seeks arbitration to determine the scope of the on-going negotiations and to compel the defendants to bargain a new agreement.

After hearing, the Court declines to issue a preliminary injunction to compel the defendants to submit to arbitration.

■ Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit and arbitrability is a question for judicial determination.

*Montgomery Mailers' Union No. 127 v. The Advertiser Company*, 827 F.2d 709, 712 (11th Cir.1987).

■ At present the parties are conducting negotiations for renewal of the collective bargaining agreement. There have been no employee layoffs while these negotiations are being conducted. Under Article 15 of the old collective bargaining agreement, that agreement expired on March 31, 1995. However, the terms and conditions of the old collective bargaining agreement shall remain in effect during negotiations for a new agreement.[2]

The terms and conditions of the old agreement thus expire when negotiations terminate either by reaching impasse or a new agreement.

Under Article 12.2 of the old agreement, any matter, *"except renewal of this contract,"* may be submitted to final and binding arbitration by either party.[3] It is clear that the formation of any new agreement is beyond the scope of the arbitration clause and such new agreement is to be arrived at through negotiations. *Montgomery Mailers' Union No. 127 v. The Advertiser Company*, 827 F.2d 709, 715–716 (11th Cir.1987).

In its demand for arbitration, the Guild alleges that the defendants violated the old agreement by their "refusal to bargain a successor agreement" and the Guild's prayer for relief requests an order from the arbitrator that defendants be required "to bargain a 'new agreement' within the meaning of Article 15.2." Such a request is beyond the scope of the arbitration clause in the old agreement which specifically excludes contract renewal as a proper issue for arbitration.

Courts have recognized the distinction between "grievance" arbitration (which concerns disputes over the interpretation of existing contracts) and "interest" or "new contract" arbitration (which allows arbitration of the terms of a new contract). *See NLRB v. Columbus Printing Pressmen and Assistants Union No. 252*, 543 F.2d 1161, 1163 n.

2. ARTICLE 15. Duration and Renewal

*Modify as follows:*
15.1 This Agreement *shall* commence on the 1st day of October, 1994, and *expire on the 31st day of March, 1995*, and shall inure to the benefits of and be binding upon the successors and assigns of the Publisher.
15.2 Within eighty (80) days, and not less than thirty (30) days prior to the termination of this Agreement, the Publisher or the Guild may initiate *negotiations for a new Agreement* to take effect April 1, 1995. The *terms and conditions of this Agreement shall remain in effect during such negotiations.* The new contract shall be made retroactive to September 30, 1994. [Emphasis supplied].

3. ARTICLE 12. Grievance Committee

12.1 The Guild shall designate a committee not to exceed three (3) members to take up

with the Publisher or its authorized agent *any matter arising from the application of this Agreement* or affecting the relations of the employees and the Publisher.
12.2 *Any such matter, except renewal of this contract,* not satisfactorily settled within a reasonable period of its first consideration *may be submitted to final and binding arbitration by either party.* The arbitration body shall consist of one (1) member designated by the Publisher, one (1) designated by the Guild, and a third member designated by mutual consent of the Publisher and the Guild, who shall act as chairperson of said arbitration board. If the parties are unable to agree on such third member within ten (10) days after an issue has been placed in arbitration, the third member shall be selected and the arbitration conducted pursuant to the voluntary labor arbitration rules of the American Arbitration Association. [Emphasis supplied].

4 (5th Cir.1976). The United States Supreme Court also has distinguished "new contract arbitration" which relates to disputes regarding the acquisition of future rights (and not the assertion of rights claimed to have vested in the past), from "rights arbitration" in which the claim is to rights that have accrued and not merely to have new rights created for the future. *Elgin, Joliet & Eastern Railway Co. v. Burley,* 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945). Courts have recognized that "rights" disputes are normally resolved through arbitration, while "interest" disputes concerning the terms of the future contract should be resolved through collective bargaining negotiations. *Cumberland Typographical Union No. 244 v. Times & Alleganian Co.,* 139 L.R.R.M. 2838, 2842 n. 3, 943 F.2d 401 (4th Cir.1991). A future collective bargaining agreement is best reached through free and unfettered negotiations uninfluenced by the pending threat of an arbitrator's dictate of the terms.

If any employee layoffs should occur *during* negotiations, the Court shall entertain a renewed Petition. If any layoffs should occur *after* negotiations have been concluded, any unfair labor practice would lie within the jurisdiction of the National Labor Relations Board ("NLRB"), before which body a case involving the same issues is presently pending.[4]

SO ORDERED.

---

4. On June 23, 1995, the Guild filed an unfair labor practice charge with the NLRB requesting essentially the same relief as this lawsuit, including injunctive relief against layoffs.