**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-2160
_____

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL UNION NO. 542

v.

ALLIED ERECTING & DISMANTLING CO., INC,
Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 2:12-cv-06579)
District Judge: Honorable Berle M. Schiller
_____

Argued on December 16, 2013

Before: JORDAN, VANASKIE, and VAN ANTWERPEN, *Circuit Judges*.

(Filed: February 04, 2014)
_____

Edward R. Noonan, Esq. [ARGUED]
Eckert, Seamans, Cherin & Mellot
1717 Pennsylvania Avenue, N.W., 12th Floor
Washington, DC 20006
        *Counsel for Appellant*

Regina C. Hertzig, Esq. [ARGUED]
Cleary, Josem & Trigiani
325 Chestnut Street
Constitution Place, Suite 200
Philadelphia, PA 19106
        *Counsel for Appellee*

———

OPINION OF THE COURT

———

VAN ANTWERPEN, *Circuit Judge*.

Appellant Allied Erecting & Dismantling Co., Inc. ("Allied") appeals the District Court for the Eastern District of Pennsylvania's declaratory judgment in favor of the International Union of Operating Engineers, Local Union No. 542 ("Union"), holding that their collective bargaining agreements were indefinite, contrary to the aims of federal labor law, and terminable by either party with reasonable notice. *Int'l Union of Operating Eng'rs, Local Union No. 542 v. Allied Erecting & Dismantling Co.*, No. 12-6579, 2013 WL 1234729, at *3–4 (E.D. Pa. Mar. 26, 2013). For the reasons that follow, we will vacate the decision of the District Court and remand for further proceedings.

## I.    BACKGROUND

Writing solely for the parties, we briefly review the essential facts. In 1992, the parties entered into two collective bargaining agreements pertaining to work dismantling a closed steel plant in Fairless Hills, Pennsylvania.[1] The agreements established wages, working conditions, and other terms.[2] The Fairless Hills project continues to date, and the Union anticipates it to continue at least another five years. (Compl. ¶ 13.)

---

[1] Each agreement covers a separate bargaining unit. The "Operator Agreement" covers equipment operators and utility personnel. The "Helper Agreement" covers helpers. The relevant provisions are identical.

[2] The agreements provided no method to renegotiate these terms. However, in 2004, Allied agreed to wage and benefit increases. Allied also recently agreed to increase contributions to the employees' healthcare plan. The record is unclear when this occurred, but the precise date does not affect our decision. (Appellant Br. at 4 (most

2

The agreements define the Fairless Hills project as "[Allied's] jobsite at the USX Corporation Fairless Hills Pennsylvania facility at which [Allied] performs dismantling work on decommissioned property pursuant to a contract with USX Corporation (herein referred to as the 'Project')." (Joint Appendix "JA" at 63, 83.) USX decides what is to be dismantled by Allied at the Fairless Hills project. Article I, Section 4 of the agreements states that "[i]n the event [Allied] is successful in procuring dismantling work at jobsites other than the Project within the Union's geographical jurisdiction, [Allied], *in its complete discretion*, may elect to extend this Agreement to such other jobsites on a jobsite-by-jobsite basis." (*Id.* (emphasis added).) The termination provision of each agreement provides that

> this Agreement shall terminate upon [Allied's] completion of the Project. As to any jobsite to which this Agreement is extended on a jobsite-by-jobsite basis[,] . . . the Agreement and [Allied's] recognition of the Union for employees employed at such jobsite shall terminate upon the completion of [Allied's] work at such jobsites.

(*Id.* at 78, 97.) The agreements also contain a severability clause[3]: "Any provision of this Agreement which now or subsequently is found . . . to contravene [the] law . . ., shall be suspended in operation . . . . Such suspension shall not affect the operation or validity of the remainder of the provisions of this Agreement." (*Id.* at 77, 96.)

In August, 2011, the Union notified Allied that it intended to terminate the agreements and requested negotiations for successor agreements. Allied filed a complaint

---

recent modification occurred in 2009)); (Appellee Br. at 5 (2010)); (Compl. ¶ 11 (2008)); (Answer & Countercl. ¶ 12 (2009)).

[3] The severability clause is Article XXI of the Operator Agreement and Article XX of the Helper Agreement.

with the National Labor Relations Board ("NLRB"), alleging that such notice violated the National Labor Relations Act ("NLRA"). The NLRB Regional Director dismissed the charge and Allied appealed. The NLRB held Allied's appeal in abeyance during the pendency of the proceedings below. The NLRB Office of Appeals then terminated its consideration of Allied's appeal following the issuance of the District Court's opinion.

The Union requested the District Court to declare the agreements terminable upon reasonable notice, which the Union claimed it provided.[4] (*See* Compl. ¶¶ 18, 20.) Allied argued that the termination provisions were valid and sought a declaration that the agreements remained in effect until completion of the Fairless Hills project. (*See* Answer ¶ 3.) The District Court held that the agreements were of "indeterminate duration" and were "inconsistent with the aims of federal labor law." *Allied Erecting & Dismantling Co.*, 2013 WL 1234729, at *3. Therefore, the parties could terminate them upon reasonable notice. *Id.* at *4. Allied appealed.

## II.[5]     DISCUSSION

"[F]ederal law governs the construction of collective bargaining agreements, [and] traditional rules of contract interpretation apply when not inconsistent with federal labor law." *Teamsters Indus. Emps. Welfare Fund v. Rolls–Royce Motor Cars, Inc.,* 989 F.2d

---

[4] In the alternative, the Union claimed that the agreements were invalid due to unilateral mistake, mutual mistake, and because they failed to reflect the true intention of the parties. (Compl. ¶¶ 26, 30, 33.)

[5] The District Court had jurisdiction pursuant to Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185. *See, e.g.*, *Mack Trucks, Inc. v. UAW*, 856 F.2d 579, 587 (3d Cir. 1988). This Court has jurisdiction under 28 U.S.C. § 2201. We exercise plenary review over conclusions of law when reviewing a decision to grant a declaratory judgment. *Borden v. Sch. Dist. of E. Brunswick*, 523 F.3d 153, 174 n.17 (3d Cir. 2008).

4

132, 135 (3d Cir. 1993) (citation omitted). "If less than all of an agreement is unenforceable [as against public policy], a court may nevertheless enforce the rest of the agreement in favor of a party who did not engage in serious misconduct if the performance as to which the agreement is unenforceable is not an essential part of the agreed exchange." Restatement (Second) of Contracts § 184(1) (1981); *see also Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 186 (3d Cir. 2010). A severability analysis requires that we determine whether a contract provision is unenforceable, and, if so, whether it may be severed from the remainder of the agreement. *See Puleo*, 605 F.3d at 186.

### A.    Article I, Section 4 is unenforceable.

Labor contracts of indefinite duration contravene federal labor policy and are terminable at will. *E.g.*, *Montgomery Mailers' Union No. 127 v. Advertiser Co.*, 827 F.2d 709, 715 (11th Cir. 1987). However, a contract may terminate upon a specified event rather than a predetermined date. *E.g.*, *UAW v. Randall Div. of Textron, Inc.*, 5 F.3d 224, 229 (7th Cir. 1993).

The District Court concluded that the agreements were of indefinite duration and terminable by both parties with reasonable notice. *Allied Erecting & Dismantling Co.*, 2013 WL 1234729, at *3. It concurred with the Eleventh Circuit's reasoning in *Montgomery Mailers' Union*, 827 F.2d at 715–16. The contract therein "continue[d] in effect for such reasonable time . . . as may be required for negotiation of a new agreement." *Id.* at 715. The union argued that under this provision, the agreement terminated only upon successful negotiation of a new agreement. *Id.*

5

The Eleventh Circuit noted that the union, which was disinclined to enter into a new agreement, "could perpetuate the existing contract by continuing negotiations but never reaching an agreement." *Id.* "The side *not* desiring a change could refuse to agree . . . . Each side could stand entrenched knowing the contract would continue as it was. The side desiring to alter the terms or conditions of the relationship would never have a prayer of success." *Id.* (quoting *Kaufman & Broad Home Sys. v. Int'l Brotherhood of Firemen*, 607 F.2d 1104, 1110 (5th Cir. 1979)). This was "contrary to fundamental principles of law, our established national labor relations policy and the intent of Congress expressed in the Labor Management Relations Act of 1947." *Id.*

The District Court found that the instant agreements reached the same untenable result. *Allied Erecting & Dismantling Co.*, 2013 WL 1234729, at *3. It reasoned that, as in *Montgomery Mailers' Union*, one party (Allied) could extend the agreements indeterminately. *Id.* It enumerated three examples: Allied could stall the Fairless Hills project, contract for additional work on that project, or "in its complete discretion, contract for additional work on other projects, extend the agreements to that additional work, and subsequently bind the Union to the agreements for an unknown and perpetually endless time period." *Id.* This would freeze wages and benefits indefinitely and prevent workers from negotiating pay raises or additional benefits. *Id.* The District Court concluded that the aims of federal labor law required allowing the parties to terminate such indefinite agreements. *Id.* (citing 29 U.S.C. § 151). Therefore, either party could terminate the agreements upon reasonable notice. *Id.* at *4.

6

On appeal, Allied argues that the agreements are not indefinite because they terminate upon the occurrence of a specified event—the completion of the Fairless Hills project. *See, e.g.*, *Randall Div. of Textron*, 5 F.3d at 229. Even if Allied extended the agreements to other projects, Allied claims those agreements would also terminate when the projects concluded. Furthermore, Allied argues that the District Court's analogy to *Montgomery Mailers' Union* is misplaced because that case narrowly applies only when post-expiration clauses extend an agreement indefinitely pending the negotiation of a new agreement.

Allied argues that, even if *Montgomery Mailers' Union* applies, the District Court erred in concluding that Allied has unilateral control over the agreements' termination. It notes that Allied's client, and not it, controls the length of the project and that there is no allegation Allied is stalling. Next, it advances numerous reasons why its "complete discretion" over extending the agreement does not render it "indefinite."

First, it argues that "each extension creates a new and separate project agreement," which terminates upon completion of that particular project. (Appellant Br. at 14.) Second, because each extension creates a "new" agreement for a distinct bargaining unit, Allied claims that the Union completely controls whether it is bound because it can always "refus[e] the extension through a valid disclaimer of interest in representing such bargaining unit." (*Id.*) Third, even if the District Court correctly uncovered the possibility of perpetual agreements, it failed to recognize that, as pertains to Fairless Hills, the agreements distinctly terminate when work is completed. (*Id.* at 14–15.) Thus "even

7

assuming that the agreements could 'go on forever' [by extension to other jobsites] it is impossible for either to go on forever at Fairless Hills." (*Id.* at 15.)

We concur with the District Court that Allied's complete discretion in Article I, Section 4 of the agreements over whether to extend these agreements to other jobsites renders the agreements indefinite. The agreements' plain language rebuts Allied's claim that each extension creates a "new and separate project agreement." (*Id.* at 14.) Article I, Section 4 and the termination provision refer to the extension of "*this* Agreement." (JA at 63, 78, 83, 97 (emphasis added).) Article I, Section 4 merely grants Allied the power to "*extend*" the agreements; it does not create "new and separate" agreements. *Cf. Nibbs v. Felix*, 726 F.2d 102, 104–05 (3d Cir. 1984) (holding that arbitration provisions were still binding after contract's termination because they were informally *extended*). Thus, the 1992 agreements (including modifications), and no others, would apply to other jobsites.

Allied unpersuasively contends that the agreements are not indefinite because they terminate upon completion of the Fairless Hills project (and that extensions terminate upon completion of work at new jobsites). Article I, Section 4 allows Allied, in its sole discretion, to extend the agreements to new projects. Even worse, at each new jobsite, the governing agreements would still contain this extension clause, permitting Allied to unilaterally extend the agreements to still other projects, *ad infinitum*. This would be true long after work at Fairless Hills concludes. All the while, Allied need never update the employment terms.[6]

---

[6] Allied's brief does not contest the District Court's conclusion that perpetuating the agreements indeterminately would "lock in the wages and benefits designated in the

8

Thus, although the facts here are distinguishable from *Montgomery Mailers'*

*Union*, the rationale is consistent. The agreements are indefinite because one party

unilaterally controls the termination event.[7] Allied may, in its complete discretion, extend

the agreements indefinitely into the future. "The side desiring to alter the terms or

conditions of the relationship would never have a prayer of success." *Montgomery*

*Mailers' Union*, 827 F.2d at 715 (quoting *Kaufman & Broad Home Sys.*, 607 F.2d at

1110).

The District Court also rested its conclusion on Allied's hypothetical ability to

"stall" the project indefinitely, thereby rendering the agreements potentially indefinite as

applied to the Fairless Hills project.[8] *Allied Erecting & Dismantling Co.*, 2013 WL

---

agreements indefinitely, depriving workers of the ability to negotiate pay raises or additional benefits." *Allied Erecting & Dismantling Co.*, 2013 WL 1234729, at *3.

[7] Allied's argument that the Union can refuse the extension by disclaiming interest in future bargaining units serves only to demonstrate how pervasive is Allied's control over termination. This is even more extreme than *Kaufman & Broad Home Systems* in which the Court noted that "there is nothing in the agreement as interpreted by [the employer] that would keep it from continuing year after year, thus forcing the [u]nion to choose between termination of the entire agreement and [indefinite continuation]." 607 F.2d at 1109.

[8] The District Court also concluded that Allied could hypothetically render the agreements indefinite by contracting for additional work on the Fairless Hills Project. However, the Union concedes that one jobsite cannot contain an infinite amount of work. (*See* Brief of Appellee at 6 n.4 ("[T]he Fairless Hills dismantling projects could only necessarily involve a finite number of buildings.").) Indeed, the Union believes the work at Fairless Hills could conclude in five years. (Compl. ¶ 13.) Obviously, under the terms of the agreements, the work will terminate at some point in time. Additionally, the agreements limit the term "Project" to "[Allied's] jobsite at the USX Corporation Fairless Hills Pennsylvania facility at which [Allied] performs dismantling work on decommissioned property pursuant to a contract with USX Corporation." (JA at 63, 82–83). Nothing in the agreements or the record purports to permit Allied to "contract[] for additional work" beyond this bargained-for scope. *See Allied Erecting & Dismantling Co.*, 2013 WL 1234729, at *3.

1234729, at *3. We find the trajectory of this argument troubling and reject it. We note especially that the District Court only found that Allied "could" extend the project by stalling, not that it ever had done so. *Id.* To begin with, it is difficult to understand how Allied "could" unilaterally stall the project since the dismantling is being done pursuant to a contract with a third party, USX. Furthermore, it is obvious that such a theoretical analysis, taken to its extreme, could render indeterminate all contracts that terminate upon completion of a project rather than a pre-determined date because one party could always *hypothetically* stall. We do not say that in an appropriate case a district court may never consider stalling—hypothetical or otherwise—as a factor; however, we reject the District Court's approach, in which hypothetical stalling is a sufficient cause of indefiniteness. We also reject any notion that contracts which terminate upon completion of work at a particular jobsite are *per se* indeterminate.

We are required to construe labor contracts in light of the "practice, usage and custom pertaining to all such agreements." *Transp.–Commc'n Emp. Union v. Union Pac. R.R.*, 385 U.S. 157, 161 (1966). Additionally, we must recognize the "'dual purpose' in the Taft–Hartley Act—to substitute collective bargaining for economic warfare and to protect the right of employees to engage in concerted activities for their own benefit." *NLRB v. Lion Oil Co.*, 352 U.S. 282, 289 (1957) (citing *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 284 (1956)). In light of these considerations, we hold that permitting Article I, Section 4 to extend the agreements indefinitely into the future "would be inconsistent with the aims of federal labor law." *Allied Erecting & Dismantling Co.*, 2013 WL 1234729, at *3 (citing 29 U.S.C. § 151 (finding that "protection by law of the right

10

of employees to organize and bargain collectively safeguards commerce" and declaring a policy of "encouraging the practice and procedure of collective bargaining")).

## B.      Article 1, Section 4 is severable.

This does not end the analysis, however. The agreements contain a severability clause which suspends the operation of any provision found "to contravene a national, state, or local law." (JA at 77, 96.) If such suspension occurs, the operation or validity of the remainder of the agreements' provisions is to remain unaffected. (*Id.*)

"[T]raditional rules of contract interpretation apply when not inconsistent with federal labor law." *Rolls–Royce*, 989 F.2d at 135. "If less than all of an agreement is unenforceable [as against public policy], a court may nevertheless enforce the rest of the agreement . . . if the performance as to which the agreement is unenforceable is not an essential part of the agreed exchange." Restatement (Second) of Contracts § 184(1); *see also Puleo*, 605 F.3d at 186. Whether performance is essential turns on its "relative importance in the light of the entire agreement between the parties." Restatement (Second) of Contracts § 184, cmt. a; *see also Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 206 (3d Cir. 2010)).

In supplemental briefing and at oral argument in open court both parties conceded that, if Article I, Section 4 is found to be unenforceable, the severability clause suspends its operation. Furthermore, the parties also agree, and we find, that Article I, Section 4 is not an essential part of the agreed exchange. The primary purpose of the agreements at issue is to establish wages, benefits, working conditions, and dispute resolution procedures for the covered bargaining units at Allied's Fairless Hills project. (*See* JA at

11

62, 82.) This goal can be accomplished without the extension provision, which pertains to other jobsites. *Cf. Prusky v. Reliastar Life Ins. Co.*, 445 F.3d 695, 699–700 (3d Cir. 2006) (holding that nonessential and illegal late-trading provisions in life insurance contract were severable).

To the extent that Article I, Section 4 and the portions of those Sections which reference it permit the agreements to be extended indefinitely into the future, these provisions should be deemed unenforceable and severed pursuant to the severability clause. What remains of the agreements is not indefinite because it terminates upon the occurrence of a specified event—completion of the Fairless Hills project. *See, e.g.*, *Randall Div. of Textron*, 5 F.3d at 229. This outcome is consistent with federal labor policy and our jurisprudence. The federal labor policy promoting labor relations stability does not permit parties to unilaterally repudiate collective bargaining agreements during the agreed-to term. *See Int'l Assoc. of Bridge, Structural & Ornamental Iron Workers, Local 3 v. NLRB*, 843 F.2d 770, 778 (3d Cir. 1988) [*Deklewa*].[9] While protecting

---

[9] The Union attempts to distinguish *Deklewa* as applying only to § 8(f) agreements; however, *Deklewa* suggests a broader application for its principle. *See, e.g.*, 843 F.2d at 773, 778 (resolving in the affirmative "whether during its term a § 8(f) agreement is as binding and enforceable *as any other union agreement*" and noting the NLRB's rationale that "a right of unilateral repudiation is . . . antithetical to *traditional principles of collective-bargaining* under the [NLRA]" (emphasis added)); *see also Builders, Woodworkers & Millwrights, Local Union No. 1 (Glen Falls Contractors Ass'n)*, 341 N.L.R.B. 448, at *1 n.2 (2004) ("Regardless of whether this may have been a 9(a) or 8(f) relationship, the . . . employers were not free to unilaterally repudiate their agreement with the Carpenters and recognize the Respondent."); *John Deklewa & Sons*, 282 N.L.R.B. 1375, 1386 (1987) ("Our new analytic framework also better fulfills general statutory policies and integrates Section 8(f) with other sections in the Act. In this regard, the policy of labor relations stability in the Act generally favors requiring parties to adhere to a voluntarily adopted collective-bargaining agreement.").

12

collective bargaining is also an overarching objective of the NLRA, we have recognized that this goal is strengthened by requiring adherence to the terms of labor contracts. *See, e.g.*, *Michota v. Anheuser-Busch, Inc.*, 755 F.2d 330, 335 (3d Cir. 1985) ("Integrity of the collective bargaining process under the [NLRA] is critical to the stability of labor relations. The ability of duly elected bargaining representatives to bargain effectively is dependent in part upon its ability to bind the employees it represents to the terms of a negotiated agreement.").

The District Court's opinion did not address the Union's remaining claims: unilateral mistake, mutual mistake, and reformation based on party intent. (*See* Compl. ¶¶ 26, 30, 33.) We decline Allied's invitation to decide these issues on appeal.

### III. CONCLUSION

For the foregoing reasons, we will vacate the District Court's declaratory judgment in favor of the Union and remand the case to that Court to determine the Union's remaining claims in a manner consistent with this Opinion.

VANASKIE, *Circuit Judge*, concurring in part and dissenting in part.

I agree with the majority's conclusion that the extension provision of Article I, Section 4 of the agreements is unenforceable. I part company with the majority, however, with respect to the holding that the collective bargaining agreements are not of indeterminate duration because they will terminate upon completion of the Fairless Hills project, a project that has spanned more than three decades since the agreements were negotiated. Indeed, there is no end in sight for the project, and I believe that is the quintessential example of an indeterminate duration. Therefore, I respectfully dissent from the majority's conclusion that the collective bargaining agreements at issue are not terminable at will by either party upon reasonable notice.

As the majority notes, "[f]ederal law governs the construction of collective bargaining agreements, [and] traditional rules of contract interpretation apply when not inconsistent with federal labor law." *Teamsters Indus. Emps. Welfare Fund v. Rolls–Royce Motor Cars, Inc.,* 989 F.2d 132, 135 (3d Cir. 1993). In interpreting labor contracts, the Supreme Court has instructed federal courts to "fashion from the policy of our national labor laws" a body of substantive federal law. *Textile Workers Union of America v. Lincoln Mills of Ala*., 353 U.S. 448, 456 (1957).

Employing this authority, federal courts have articulated the principle that "[l]abor contracts of indeterminate duration are generally terminable at will upon reasonable notice to the other party." *Communications Workers of America v. Southwestern Bell Telephone Co*., 713 F.2d 1118, 1123 n. 4 (5th Cir. 1983); *Boeing Airplane Co. v. NLRB*, 174 F.2d 988, 991 (D.C. Cir. 1949); *Montgomery Mailers' Union No. 127 v. Advertiser*

1

*Co.*, 827 F.2d 709, 715 (11th Cir. 1987).  This is because our labor laws encourage collective bargaining between labor organizations and employers as a means of both ensuring "the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions," as well as safeguarding the "equality of bargaining power between employers and employees."  29 U.S.C. § 151.  In the absence of a periodic opportunity to adjust wages, hours, or working conditions, an indefinite labor agreement becomes a tool that exacerbates the inequality of bargaining power between employers and laborers, rather than providing a bulwark against it.

The majority acknowledges that the agreements as written cannot stand, as they purport to give Allied the unilateral ability to extend the agreements indefinitely to any new jobsites they desire.  Rather than taking the remedial step of declaring the agreements terminable at will by either party, the majority seeks to reform the indefinite contracts to limit them to a definite duration.  To do this, the majority strikes Article I, Section 4. but leaves in place the provision indicating the agreements will terminate upon the completion of "[Allied's] jobsite at the USX Corporation Fairless Hills Pennsylvania facility."  (App. 78)

The majority believes this fix renders the agreements definite and enforceable, noting that the "Union concedes that one jobsite cannot contain an *infinite* amount of work."  Maj. Op. at 9, fn. 8 (emphasis added).  But indeterminate does not mean infinite. Indeterminate is defined as "uncertain; not ascertained; not fixed; not made certain." Ballentine's Law Dictionary 610 (3rd ed. 1969).  For instance, an agreement that provided that it would terminate upon a certain person's death would be indeterminate

2

because, although a human lifespan is not infinite, its duration is not capable of being ascertained in advance by the parties to the contract.

Although I agree that this case does differ from *Montgomery Mailers Union*, upon which the District Court relied, in that neither party to the contracts possesses the unilateral ability to extend the collective bargaining agreements in perpetuity, this case similarly presents contracts whose duration cannot be fixed or ascertained by the parties in advance of termination. The majority comforts itself that "the work at Fairless Hills could conclude in five years" (Maj. Op. at 9, fn. 8), but when pressed at oral argument, Allied's counsel conceded that he had "no idea how long it could take" for the Fairless Hills project to be completed. (Oral Arg. At 31:46-31:50). Uncertainty about the amount of time the contracts will govern the relationship between the parties prevents the members of the union from knowing how long they will have to continue to labor under the existing contractual terms—negotiated more than twenty years ago—before being permitted to renegotiate. The duration of the agreements is, therefore, "uncertain; not ascertained; not fixed; not made certain." Ballentine's Law Dictionary at 610.

The majority's conclusion that the agreements are not indeterminate because the projects will be completed at some unknown time in the distant future thwarts federal labor law's preference for the negotiated adjustment of "industrial disputes arising out of differences as to wages, hours, or other working conditions." 29 U.S.C. § 151. In this instance, it is the laborers whose terms and conditions of employment are frozen indefinitely. In another instance, it may be the employer who becomes hostage to a collective bargaining agreement of indefinite duration, negotiated perhaps at a time when

3

organized labor had the upper hand in bargaining. The point is that neither labor nor the employer should be unable to negotiate the terms and conditions of employment on a periodic basis. The majority's holding effectively forecloses the union from doing so on behalf of its members for however long it may take to complete the Fairless Hills project.

The majority notes that "federal labor policy promoting labor relations stability does not permit parties to unilaterally repudiate collective bargaining agreements during the agreed-to term." Maj. Op. at 9 (citing *Int'l Assoc. of Bridge, Structural & Ornamental Iron Workers, Local 3 v. NLRB*, 843 F.2d 770, 778 (3d Cir. 1988) [*Deklewa*]). But *Deklewa* concerned a very different factual scenario—an employer's attempt to renege on a collective bargaining agreement with a fixed three-year term. *Id.* at 772. I would not extend *Deklewa* to the type of agreements at issue here, which have no ascertainable duration. In such cases, federal labor law's interest in stability is outweighed by its concern with equalizing bargaining power between labor organizations and employers and preventing the ossification of disputed wages, hours, and working conditions. *See* 29 U.S.C. § 151.

Because I believe considerations of federal labor policy weigh in favor of allowing the parties to terminate the agreements at issue upon giving reasonable notice, I respectfully dissent.